[Civ. No. 15125. First Dist., Div. One. May 28, 1952.]

FRANK PERATA et al., Respondents, v. OAKLAND SCAVENGER COMPANY (a Corporation), Appellant.

St. Sure & Moore for Appellant.

Elliott Johnson and W. I. Follett for Respondents.

BRAY, J.—This appeal by defendant from a judgment in favor of plaintiffs raises primarily the interpretation of the by-laws of defendant corporation as to a stockholder who desires to terminate his connection with the corporation, and the question of whether the monthly payments to working stockholders were solely wages or included dividends.

## FACTS

Defendant is a California corporation engaged in the scavenger business. Each of its 208 stockholders owns 100 shares of stock. In 1935 plaintiff Gamba became a stockholder by purchasing 100 shares for $12,500; plaintiff Perata inherited in 1920 his 100 shares; plaintiff Rossi purchased his in 1933 or 1934 for $11,500; and plaintiff Ferro purchased his in 1930 for $11,500. In 1939 the by-laws were amended in the present form and all stockholders, including plaintiffs, signed them. As required by the by-laws all stockholders worked in the company business. There were a number of nonstockholder employees, usually referred to as "helpers." During 1943 these helpers were paid from $7.50 to $8.00 per day. May 1, 1944, the rate was changed to from $8.00 to $9.50. October 15, 1944, it was changed to from $8.50 to $9.50. Working stockholders were paid a monthly "basic rate" which, during the period here involved, was $400 per month. From this amount was deducted any collections made by the stockholder and not turned in, income tax withholding, unemployment insurance and deductions for time off. There was a period during which the basic rate was $350 per month

and $50 per month additional was paid the employee-stockholder. It is not clear just what this so-called "side money" was. The trial court treated it as a part of the basic rate, and we have done so.

This controversy arose when each plaintiff respectively quit work, all except Perata without the express consent of the board of directors. Perata had broken his elbow in 1931, and because of it was bothered in his work. He told the director of men that he wanted time off as his doctor had told him to quit work. He was referred to the board. Later he was informed by the director that his request was granted. He left his employment November 30, 1943. Gamba went into the Merchant Marine, being given time off from March, 1942, until March, 1945. From March, 1942, until September, 1943, he received full pay less a deduction for employment of a substitute. For the balance of the period he received no pay. He returned to work June 1, 1945, and worked until March 1, 1946. In February he told the director and board that he was leaving because of his health and because he was dissatisfied. He was told that his stock could not be sold at that time. There was some talk to the effect that the only way he could get out of the company was to fight. He quit. Ferro quit December 31, 1945, giving notice to that effect at a regular monthly meeting in November, because he was dissatisfied. Rossi quit June 10, 1946. Prior thereto he presented to the board a letter from his doctor advising him to quit. He was told to wait a few months as the company was short of men. He refused. The stock of all plaintiffs was sold by the board on May 7, 1947. Each 100 shares brought $13,000, and that sum was paid by the company to each of the plaintiffs except Rossi. Approximately 16 months after Rossi quit he was notified that he was fined for not working $100 per month for the 16 months prior, from July 1, 1946, to November, 1947. Although fines were usually entered in the minute book of the board, no fines appear against any of the plaintiffs, not even Rossi. None of the plaintiffs received any pay or dividends from the date each quit work. Defendant's president testified that the board decided not to fine plaintiffs for not working but merely not to pay them. No formal action in this respect appears in the minutes. There was evidence that when all other stockholders wanted to quit they continued working until their stock was sold by the board. Plaintiffs brought this action to recover dividends payable from the time each quit until his stock was

sold, contending that besides the declared dividends that portion of the monthly pay which exceeded the $8.00 per day stated in the by-laws and hereafter mentioned, or at least that portion which exceeded the wages paid for replacement of their work, constituted dividends.

## FINDINGS

The court made extensive findings, the substance of which was that long established custom required that each stockholder must own 100 shares and that by such custom and the by-laws each stockholder must work for the corporation subject to the provisions of the by-laws as to time off from work; that the company during the period in question earned net profits which varied from month to month; that it was provided by long established custom that each stockholder except the president and vice-president must at all times receive the same amount of money monthly except for deductions provided by the by-laws; that the stock of each plaintiff, endorsed in blank, was held by the corporation from date of issuance to date of sale, for safekeeping and to enable defendant to enforce the provisions of article V of the by-laws; that until the sale of the stock of each respective plaintiff he was entitled to receive from defendant the same amount as paid by defendant to any other stockholder except the president and vice-president and except as such amount should be reduced for time off as provided in article VII, section 12 of the by-laws, and less such portion of said money as constituted a reasonable wage for the work performed by a stockholder; that from November 30, 1943, to May 1, 1944, $8.00 per day and no more, from May 1, 1944, to May 7, 1947, $9.50 per day and no more, were reasonable wages to be paid each stockholder employed by defendant during the respective periods; that all monthly distribution to each of said stockholders over and above said sums were dividends to the extent they exceeded such reasonable wages; that such excess payments were made under the guise of compensation but were in fact not so paid but were paid without regard or reference to the services performed by each stockholder and in certain instances in the absence of the performance of any services; that such excess was paid out of the corporation earnings and was dividends; that each plaintiff was entitled to receive for the period between the time he quit working and the sale of his stock the difference between $400 per month and the reasonable wages of helpers above mentioned for all

working days (the court figured 26 working days to a month). The court then awarded Perata as dividends for that period, figured in that way, the sum of $6,479.50, and for additional sums which were paid to the stockholders over that period as declared dividends, and for interest on both types of dividends, the total sum of $2,428.86, or a total sum of $8,908.36. It awarded Rossi, on the same basis, $3,422.35, Gamba, $7,870.71, and Ferro $3,181.93. No attack is made on the correctness of the arithmetic of the computations.

## BY-LAWS

Those important here follow.* Articles V and VI state that the corporation is, in effect, a membership corporation, and because it is particularly important that each stockholder shall enjoy the respect and confidence of all other stockholders and to insure that the stock shall not come into the hands of persons not acceptable to the other stockholders, each stockholder agrees that the restrictions and limitations upon the transfer of stock shall be a part of the by-laws and a contract between each stockholder and every other stockholder. Each stockholder is required to endorse his certificate of stock and deposit it with the board with whom it must remain during the "lifetime of said stockholder." Upon his death the title to the stock becomes vested in the board. No stockholder can sell or assign his stock to any person not approved by the board. In the event of the death of the stockholder provision is made for its transfer to a male relative, if such relative is acceptable to the board. If there be none, then the board may sell the stock at a price to be determined by the board and pay the proceeds to the wife or heir of the stockholder. If the stockholder is guilty of theft and is expelled from the corporation he shall accept from the board the reasonable value of his stock. The opinion and judgment of the board as to transfers of stock under this article are final and conclusive. All stockholders are required to attend all stockholders' meetings under penalty of fine. All operations of the corporation are secret and must not be divulged by the stockholders.

Article VII provides the duties of workers who are stockholders. They must pay for loss of tools or truck equipment and for all damages caused by them or a truck driven by them. Fines are provided if the stockholder fails to report for work or give notice of illness.

---

*Unless otherwise noted, all emphasis (except titles of sections) is ours.

Section 9 of Article VII provides as follows: *"General Duties of Employees and Stockholders.* Each employee or stockholder of this Corporation *shall devote all his time to the work of this corporation and shall gather personally,* according to the custom of this corporation, all rags, bottles, newspapers, paper and other articles of salvage within the field of his particular work. *For each time he fails in this duty, he shall be fined an amount to be determined by the Board of Directors."*

Section 11 of article VII provides as follows: *"Failure or Refusal to Follow Orders of the Board of Directors.* Each employee or stockholder of this corporation who shall refuse or fail to carry out strictly the orders of the Board of Directors of this Corporation, or of the President, or other persons authorized to give such order, shall be fined Ten Dollars ($10.00) and shall be laid off from work for a period of one month, and during such period of layoff, he shall have no right to any wages, dividends, or other compensation from this corporation. . . ."

Section 12 of article VII provides as follows: *"Time Off.* Any employee or stockholder of this corporation desiring to have time off, must advise the Director of Men the day before, and such person *shall not take any time off without the consent of the Director of Men.* Failure to observe this rule shall subject the employee to a fine of Five Dollars ($5.00). Each stockholder or employee desiring time off shall be charged Six Dollars ($6.00) per day for all time off up to and including fifteen (15) days, and Eight Dollars ($8.00) per day for all time off in excess of fifteen (15) days, and such amounts shall be deducted from the salary, dividends or other compensation to be paid by this corporation to said stockholder or employee."

Section 13 of article VII provides as follows: *"Payment of Fines.* No stockholder or employee of this corporation who has been fined . . . shall receive any wages, dividends or other compensation from this corporation until said fine has been paid. Said employee or stockholder shall be suspended from doing any work for this corporation from the time said fine is assessed, until it has been paid."

A study of the by-laws shows (1) that it was contemplated that all stockholders would work in the business; (2) that such work should be continuous except when excused by the director; (3) that for infractions of the rules or orders of the board, the stockholder could be fined, the fine to be de-

ducted from any moneys, either wages or dividends, to which the stockholder might be entitled; (4) that for refusal to carry out orders the stockholder could be laid off work for one month; (5) that it was expected the stockholder would work for life, and on his death his place could be taken by a male relative if available and suitable; (6) that the board at all times had control of his stock and it could be sold only to whom and for a price determined by it (in practice, the stock could be sold only by the board and not by the stockholder); (7) that for time off a fixed amount was to be deducted from the stockholder's pay.

## MEMBER MAY QUIT

■ Although there is a provision for expelling a member, in which event he will receive the reasonable value of his stock, no provision is made in the by-laws for a member voluntarily severing his connection with the company. Although it would appear from article V, section 2, which requires the stock to remain with the board during the member's lifetime, that a member will work indefinitely for the corporation, defendant concedes that there legally could be no requirement that a member could never quit and must work for the corporation for the balance of his life. Such a requirement would constitute a form of peonage. All parties agree that by signing the by-laws and acceptance of stock a contractual relationship is formed between the member and the company and his fellow members. There is nothing, however, in that contract that prohibits, or could prohibit, a member from terminating that relationship. Nor does that relationship require, as contended by defendant, that after a member quits and while his stock is still being held by the corporation, he be not entitled to dividends. He still has a financial interest in the corporation. His money is still working for the corporation. As he is not rendering any service, he, of course, is not entitled to compensation, as distinguished from dividends.

In construing the by-laws it is necessary to give them such an interpretation as to permit a stockholder who, for any or no reason, wants to quit, the right and opportunity to do so. Nor should any penalty be exacted unless there is a clear and definite provision authorizing such penalty. The by-laws provide none. Therefore, a member having the right to quit, and the by-laws providing no penalty therefor, the board had no right to impose a penalty. Particularly is this so, when it is remembered that under the by-laws and the practice of the corporation, a stockholder has

no right to sell his stock, and moreover, it cannot be sold until the board determines when, to whom and for what price it may be sold. In practice, the board fixed a price for the stock and apparently would not sell it until such price was obtained. Were it not so, the board could penalize the quitting stockholder (as it attempted to do in the Rossi case) $100 per month and then hold up the sale of his stock until the penalties had accumulated to equal or exceed the sale price. It must be borne in mind that the stockholder cannot sell his stock at a loss.

In the Rossi case, the board, approximately 16 months after he quit, attempted to levy a retroactive fine against him of $100 per month. The provisions of the by-laws authorizing fines obviously contemplate nonexcused layoffs, violations of orders, etc., *during* the time the stockholder is still an employee of the corporation. They do not contemplate punishment for terminating service. There is a provision that if a stockholder refuses to carry out orders strictly he may be fined $10 and laid off for a period of one month. There were no orders which plaintiffs violated. If it be deemed that refusing to work after quitting constituted a violation of orders, still the by-laws cannot be interpreted to permit either a fine to be imposed on such member or a denial of his right to receive dividends with the other members as long as the board neither sells nor permits him to sell his stock. A reasonable interpretation of the by-laws is that a member may quit without penalty; that, on quitting, he is no longer entitled to compensation for work, as he is no longer working. He is, however, entitled to whatever dividends are being paid other stockholders until such time as his stock is sold. This brings us to the question—

### Did the Monthly Payments Include Dividends?

 The court found that they did and that the amount thereof was the difference between the payments and the going price for helpers who were paid on a daily wage basis. The monthly payments were carried on the books as wages and from them were deducted federal withholding, social security, and state unemployment taxes. Thus, there was no segregation of any portion to dividends. Nevertheless the evidence supports the court's finding that, at least, some portion was a dividend. Although there is testimony that some of the members did not get the basic monthly rate,

practically all did regardless of the service they rendered.* The president testified that the amount paid the stockholder did not depend upon the time he worked. While most of the stockholders did similar work such as driving trucks, picking up garbage, making collections of service charges, etc., some of the members, because of age or otherwise, did not do as much work. During the war about 70 members went into the armed forces. The corporation paid them a flat $125 per month less withholding and other taxes. Gamba was paid on this basis for six months, and then, apparently because he was in the Merchant Marine and received pay therefrom much higher than that received by those in the armed forces, his pay was stopped altogether. The highest rate of pay during the period involved to any helper who performed somewhat similar services was $9.50 per day; whereas the payments to practically all members figured on a 26 working day month amounted to $15.38 per day. The payment of $350 per month until September, 1946, and thereafter of $400 per month, was called ''basic rate.'' The income of the corporation supports the conclusion that a portion of this basic rate came out of what would otherwise have been profits. The president testified that one of the reasons why the working stockholders received more pay than a helper was because the former ''has a certain amount of money invested in the company.'' If a helper took a day off, a full day's pay was deducted, while under article VII, section 12, only $6.00 a day was to be deducted from stockholders for the first 15 days and $8.00 per day thereafter. If a portion of the stockholder's pay was not a dividend, it would seem logical that for his day off his entire day's pay would have been deducted. Both Perata and Gamba testified that a portion of the monthly pay was a dividend. ■ Although the officers of the corporation testified to the contrary, the credibility of the witnesses was for the trial court to determine. (*Bechtold* v. *Bishop & Co., Inc.,* 16 Cal.2d 285 [105 P.2d 984].) ■ One member took approximately four years off, and was paid the full basic pay less only the cost of replacement by a helper. At least three or four members took from nine months to a year off to visit Italy and were paid on the same basis, at least for six months. The foregoing constitutes ample evi-

---

*The president and vice-president received a higher monthly rate but were the only ones who did. As that fact does not affect the question under consideration, it will be ignored hereafter.

dence to support the court's conclusion that the monthly payments included dividends. ██ As said in *De Martini* v. *Scavenger's Protective Assn.*, 3 Cal.App.2d 691, 698 [40 P.2d 317] : ". . . by merely calling the distribution wages, a corporation may not so distribute the profits as to deprive any stockholder of his rights thereto." In that case plaintiffs were stockholders in the defendant corporation, each owning the same number of shares as did each of the other stockholders. Most of the stockholders worked for the corporation, although there was no requirement that they must do so. Plaintiffs did not. The employee stockholders were paid $316 per month less $6.50 per working day for layoffs. The court held that the payments were only in part wages and the balance was a distribution of the profits. It quoted from *Nichols* v. *Olympia Veneer Co.*, 139 Wash. 305 [246 P. 941, 48 A.L.R. 504] : "The appellant's right is to share in the profits of the corporation. As a stockholder she is entitled to a just proportion of all the earnings of the corporation that may justly be classed as a division of the profits, whatever may be the form adopted for their distribution. The respondent is permitted to select the manner, and, if it chooses to do so in the form of wages, it is acting within its rights. But by calling the distribution wages it cannot deprive the appellant of her just proportion thereof. It cannot, by paying excessive or extravagant wages to the working stockholders, deprive the appellant of her share of the profits of the business." Ordinarily courts will not interfere with the sound judgment of the officers of a corporation in determining the wages to be paid (see *Fornaseri* v. *Cosmosart Realty & Bldg. Corp.*, 96 Cal.App. 549 [274 P. 597] ; *Reclamation D. No. 1500* v. *Reclamation Board*, 197 Cal. 482 [241 P. 552]), " '. . . but, in a suit brought by a protesting stockholder owning stock in a company, which is of no tangible value unless dividends are paid upon it, we have no hesitancy in saying that, when the amount allowed to stockholder employees becomes grossly disproportionate to the amount paid to hired employees in the plant, then the attempted action on the part of the trustees, called by whatever name, is in reality a distribution of dividends in which every stockholder is entitled to share.' " (*De Martini* v. *Scavenger's Protective Assn.*, *supra*, 3 Cal.App.2d 691, 698, quoting from *Nichols* v. *Olympia Veneer Co.*, 135 Wash. 8 [236 P. 794].)

In our case, it manifestly would be unfair to deprive the

plaintiffs during the time they are awaiting the action of the board in selling their stock, and hence getting no return therefrom, of the same return by way of dividends that other stockholders receive. *Sunset Scavenger Co.* v. *Commissioner of Internal Rev.*, 84 F.2d 453, cited by defendant, does not support its contention. There a San Francisco scavenger corporation held a meeting of its members every two weeks where, after deducting certain estimated amounts of expenses for the next two weeks, the balance of the receipts were equally distributed among the members. In its income tax return the corporation took deductions as salaries and bonuses of these amounts so distributed to the members. The Board of Tax Appeals declined to allow such deductions but did allow as a deduction a uniform salary of $300 per month per member. In its petition to the United States Circuit Court of Appeals, the corporation contended that the board erred and that the corporation was entitled to deductions of the entire amounts distributed to its members. The court held, in effect, that these were unreasonable allowances for salary under the income tax act. It then held that the allowance by the board of the $300 per month deduction was " 'not inadequate, even upon the daily wage basis contended for . . .' " by the corporation. (P. 456.) It pointed out that the evidence showed that a helper received $5.50 per day for a 12-hour day. The members worked about three and a half hours more per day than helpers. Computing these hours at double rate of pay, would entitle a member to $9.35 per day, which was approximately the amount the board allowed. The court held that this was substantial evidence to support the board's findings as to a reasonable amount to be considered salary. The corporation introduced evidence of members that the reasonable value of their services was $16 or $17 per day, and evidence that street sweepers received $5.50 for an 8-hour day, and double time for overtime work. The corporation then introduced a table showing that if street sweepers worked as many hours as the members, they would be entitled to receive $510 per month. Therefore, it contended, members should receive no less. As to this argument the court said "it is incredible that a garbage collector is entitled to nearly $20 a day for garbage collection." (P. 456.) Thus, instead of holding, as contended by defendant, that the court is bound by the determination of a corporate board of directors as to what is salary, the case holds just the contrary.

In *Kohn* v. *Kohn*, 95 Cal.App.2d 708 [214 P.2d 71], the court listed a number of cases commencing with *De Martini* v. *Scavenger's Protective Assn.*, *supra*, 3 Cal.App.2d 691, which considered the question of whether dividends were actually included in salaries, and then said (p. 715): "The rule to be gleaned from these cases is that, however denominated, a distribution of earnings to corporate stockholders may be treated as dividends where that is their practical effect and justice will be served by so treating them."

Having determined that the basic monthly pay includes dividends the next question is—

### WHAT WERE THE DIVIDENDS INCLUDED?

There was considerable evidence concerning the relative duties of members and helpers. While there was some evidence that the helpers did not do the same character of work as the members, such as driving trucks and making collections, there is substantial evidence that as regards some of the helpers the character of the work was the same. The main differences between the helpers and the members are the following: a member is bound by the obligations of the by-laws; the members take care of most of the money collections; the member is subject to fine if he does not take care of his truck and equipment, and is liable for any loss of tools or equipment or for any damage to persons or equipment done by his truck; members might work longer hours in order to make the collections and to drive the truck to and from the disposal plant (generally, however, the helpers worked at least as long if not longer than the members); members are required to wash their trucks once a week; members are required under penalty of fine to attend monthly meetings; members are required to do certain Sunday work not required of helpers (they receive extra pay for this but are fined if they do not do it). The rules required that only a member drive a truck, although this rule was broken in practice. While helpers did some collecting of service charges, the route books were kept only by members. The latter were responsible for the correctness of the collections and for proper accounting to the corporation. Plaintiff Gamba testified that while on the whole the helpers did the same character and amount of work as the members, the members had extra responsibilities, and therefore their value to the corporation was worth the difference between the amounts paid the helpers and the amounts the members received.

At the trial plaintiffs contended that the proper measure of dividends in the monthly pay was the difference between that pay and the $8.00 per day which under section 12 of article VII a member was to be charged for time off. They say that the by-laws thereby indirectly fixed as dividends any sum which a member might receive in excess thereof. This is a nonsequitur. There is nothing in the by-laws, that section included, that indicates that the salary of the members was being fixed. Necessarily, in the first instance, salaries are for the determination of the board. The trial court evidently rejected this theory, as it did not use the $8.00 per day as a basis for its computations. A study of section 12 in connection with the rest of the by-laws shows that it had no application to a situation where a member quits work altogether.

The trial court based its determination of what were dividends upon the difference between the monthly payments and the highest sum paid for helpers at a particular time. The court evidently did this on the basis that there was evidence which showed that on the whole, the type and amount of work done by the members and by the helpers were the same. As that evidence is substantial we are bound by the court's determination to that effect. There is no direct finding to that effect but it is implied in the court's findings that the reasonable daily wage of each member is no more than the sums mentioned, which sums are the highest wages paid helpers at the specified time. There is evidence that some stockholders performed less work than did the helpers, just as some stockholders did more, and as some helpers did less work than other helpers. But there is no evidence that taking the members as a whole they did any less work than the helpers as a whole. In *Nichols* v. *Olympia Veneer Co., supra,* 246 P. 941, where the court required that, over and above the amount of work done, consideration be given to the stockholders' responsibilities, the services rendered by the members were unequal in value. The court said (p. 943): "Of the 90 or more working in the plant the far larger number do only routine work of .the same character as that performed by the nonstockholders. It does not necessarily follow, however, that the services of these are not of greater value to the corporation than is the service of the nonstockholder." If in our case the court's implied finding is a finding that the services *and* responsibilities of a member are of no greater value than the wages paid helpers,

then the finding is unsupported. While there is a conflict as to whether the type and amount of work done by helpers equal that of members, there is no conflict as to the fact that the members have, as we have heretofore pointed out, far greater responsibilities than the helpers. The responsibility for damage "to any person or thing" provided in section 5, article VII, alone would entitle the member to a greater compensation. (It does not apply to damage by truck or equipment.) The section provides that in the event of such damage the board may determine the extent of such damage and its determination shall be final and conclusive and it shall collect the amount of the damage from the member. Another difference of importance between a member and a helper is that helpers being hired directly must be paid full wages whether the corporation is in the black or not. Members' wages are dependent upon the corporation's taking in sufficient funds to pay them. Another element to be considered is expressed in *Nichols* v. *Olympia Veneer Co., supra,* 246 P. 941, 943: "The stockholders have an interest in the success of the business aside from the wage received, and it would follow from the nature of the relation that they would take a greater care and exercise a higher degree of diligence in performing the work assigned them than would one whose sole remuneration was the wage he received." It is obvious that the court did not give consideration to this issue. It was an issue before the court, as the defendant contended at all times, in addition to its contention that the members actually worked harder and devoted more time than helpers, that the added responsibility of the members was worth the excess over a helper's wages. The court should have made a finding on the subject. If the court intended in the finding it did make as to the reasonable value of the services of members that the members did less work than the helpers and hence the allowance of the highest helper's wage included an allowance for the member's responsibilities, there is no evidence to support such a finding. The situation is identical with that in *Nichols* v. *Olympia Veneer Co., supra,* 246 P. 941. There nonstockholding employees in a plant were paid $4.00 per day. Stockholding employees were paid $8.00 per day. An action was brought by the widow of a deceased stockholder, contending that a portion of the $8.00 per day payment was a dividend and to collect such a dividend on her stock. The trial court found that the $4.00 per day was a rea-

sonable sum to be paid for the character of services rendered by the nonstockholders and that $8.00 was a reasonable daily wage to be paid for the nature and value of the services rendered by the stockholders. The reviewing court, after pointing out that the question was complicated by the fact that the services of the stockholders, as between each other, were unequal in value, the services by most could be procured by hire at less than $8.00 per day while those by a few could be procured only at that rate, held that in considering the widow's right as a stockholder to share in the profits of the corporation, the wages allowed working stockholders were excessive. The corporation could not by paying such excessive wages to working stockholders deprive the nonworking stockholder of her share of the profits of the business. It then went on to determine what portion of the $8.00 over and above the amount of $4.00 which was the price at which, on the average, similar hire could be had, should be allowed for the interest in the work and the responsibilities which a stockholder has and which the hired worker does not have. It then said (p. 943): "While there is no exact mathematical rule that can be applied and any rule of apportionment must be somewhat arbitrary, a more just division, we think, would be to hold that $6 per day represented the extreme value of the services rendered by the several stockholders, and that $2 per day of the sum paid them represented profits. Since the appellant is a stockholder and entitled to share in the profits, she is entitled to recover from the corporation a sum equal to that paid as profits to the other stockholders. This would be $2 per day for the number of working days . . ."

This difference of the value to a corporation of a member over that of an ordinary worker is, of course, somewhat of an intangible nature. We believe that its determination comes within the rule concerning the value of certain types of work, namely, that it is a matter of common knowledge. (See *Collier* v. *Landram*, 67 Cal.App.2d 752 [155 P.2d 652]; *Schwartz* v. *Premium Products Co.*, 98 Cal. App.2d 780 [221 P.2d 334]; *Seedborg* v. *Lakewood Gardens Civic Assn.*, 105 Cal.App.2d 449 [233 P.2d 942].) A fair and just determination of the value of a member's services over those of a helper (assuming as we are required to do under the trial court's findings that the time and amount of services are the same, but taking into consideration all the matters hereinbefore discussed), would be the

highest pay of helpers at the particular time plus one-half the difference between that pay and the $15.38 per day paid members. Thus in the period when the highest helper's rate was $8.00 per day, the reasonable value of a member's services would be one-half of the difference between $8.00 and $15.38, or $3.69 plus $8.00, making a total of $11.69. During the period when the maximum helper's pay was $9.50 per day, the value of a member's services would be one-half the difference between $9.50 and $15.38, or $2.94 plus $9.50, making a total of $12.44. Therefore, the amount of the $15.38 chargeable as dividends would be $3.69 at the time the highest helper's pay was $8.00 per day, and $2.94 at the time such pay was $9.50 per day.

The trial court is directed to amend the findings, conclusions of law and judgment accordingly. This will require a new computation of the amounts due each plaintiff and the interest thereon. The determination by the trial court of the amount of moneys paid to stockholders by the corporation as designated dividends is in nowise changed.

### FINDINGS ON CONSENT

In addition to the findings made on the evidence hereinbefore discussed, defendant contends that the evidence fails to support the findings in which the court found that each of the plaintiffs had obtained the necessary consent to take time off and hence brought themselves within the provisions of the by-laws which entitled them to their pay less only a specified deduction per day. So far as plaintiff Perata is concerned, there is substantial evidence that because of his injured arm he was given consent by the director of men that he not work while awaiting the sale of his stock. As to plaintiff Gamba, the evidence shows that the time he was off during his service in the Merchant Marine was with consent. As to all plaintiffs, although there is no direct evidence of consent, the fact that the board and director of men knew that they had quit, and that no fines or other punitive action (except the attempted fine of Rossi 16 months later), might justify an inference of consent. However, whether these findings are supported or not is unimportant. The evidence shows that whether plaintiffs received consent or not, they were actually quitting the corporation and hence did not need any consent, and as we have heretofore shown, the penalties for time off provided in the by-laws do not apply. As to the period plaintiff Gamba was in the Mer-

chant Marine he might technically be entitled to the difference between the individual month's pay being paid all stockholders and the $8.00 per day mentioned in section 12 of article VII. However, inasmuch as it appeared to be the custom and practice during that war period to pay all stockholders in the armed forces a less sum than that, and as the evidence shows that from time to time, in actual practice and without amending the by-laws, the board has deducted more than $8.00 per day for layoffs, it would seem fair to allow for that time off period the same amount as is allowed after he quit.

It is contended that there is some confusion in the findings as to whether plaintiffs had stopped working pursuant to article VII, section 12, or are not subject to the provisions of that section. Inasmuch as we have determined that that section does not apply to stockholders terminating their employment, such confusion, if it exists, is immaterial.

As herein set forth, the trial court is directed to make the necessary amendments to the findings of fact, conclusions of law and judgment to accord with the views herein expressed. As so modified the judgment is affirmed. The parties shall bear their own costs.

Peters, P. J., and Wood (Fred B.), J., concurred.

The petitions for a rehearing were denied June 27, 1952, and appellant's and respondents' petitions for a hearing by the Supreme Court were denied July 24, 1952. Schauer, J., was of the opinion that the petitions should be granted.