697 F.2d 1297
 30 Fair Empl.Prac.Cas. 225,
31 Fair Empl.Prac.Cas. 50,
30 Empl. Prac. Dec. P 33,128
Joaquin Moreles BONILLA, Armando Cardenas, Enrique Cardenas,
Heliodoro Cardenas, Benjamin Ceja, Jose Guzman, Jose Lopez,
Luis Magallon, Octavio Marquez, Raul Mendez, Gilberto
Palafox, Joel Pinedo, Felix R. Sanchez, Jesus Sanchez,
Curtis Stredic, individually and on behalf of all others
similarly situated, Plaintiffs in Intervention,
v.
OAKLAND SCAVENGER COMPANY, International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of
America, Local 70, Defendants.
Perfecto MARTINEZ, et al., Plaintiffs,
v.
OAKLAND SCAVENGER COMPANY, International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of
America, Local 70, Defendants.
 No. 81-4522.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 12, 1982.
Decided Nov. 9, 1982.
As Amended on Denial of Rehearing
and Rehearing En Banc
Feb. 17, 1983.
 
 B.V. Yturbide, Gunheim & Yturbide, San Francisco, Cal., for plaintiffs in intervention.
 Stephen A. McKae, Moore, Sizoo & Cantwell, Oakland, Cal., for defendants.
 Appeal from the United States District Court for the Northern District of California.
 Before KASHIWA,* ANDERSON, and FARRIS, Circuit Judges.
 FARRIS, Circuit Judge:
 
 OVERVIEW
 
 1
 In January 1975 a group of black and Spanish-surnamed employees filed an individual and class-action discrimination suit against their employer, the Oakland Scavenger Company, and their union, Local 70 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America. After the first group of plaintiffs had settled their individual claims, the present group of one black and fourteen Spanish-surnamed employees intervened. The class of plaintiffs consisted of all black and Spanish-surnamed employees at the Company who were dues-paying members of the Union.
 
 
 2
 The complaint charged the Company with discriminating on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq.,[1] and the Civil Rights Act of 1866, 42 U.S.C. Sec. 1981.[2]
 
 
 3
 The plaintiffs specifically charged the Company with (1) discriminating against black and Spanish-surnamed employees by restricting ownership of the Company's shares to "family members," all of whom were of Italian ancestry, and (2) discriminating among the nonshareholder-employees on the basis of race and national origin. The plaintiffs charged the Union with breaching its duty of fair representation by including the shareholder preference plan in the collective bargaining agreement and by not representing a former employee at a grievance hearing.[3] The plaintiffs sought appropriate relief and monetary damages.
 
 
 4
 The district court dismissed the action against the Company under Fed.R.Civ.P. 12(b)(6) on the ground that the plaintiffs had failed to state a claim upon which relief could be granted. Its order of dismissal did not mention the plaintiffs' complaint against the Union, nor did it discuss the charge of discrimination among nonshareholder-employees.[4] We reverse and remand.FACTS
 
 
 5
 The Oakland Scavenger Company began as a garbage collection company founded in 1909 by a number of independent garbage collectors and scavengers. The five original directors, the original shareholders, and all succeeding directors and shareholders have been of Italian ancestry. Until World War II created a labor shortage, all employees of the Company were shareholders. Since that time, it has hired as many "outsiders" as it needed to fill positions that it could not fill with other family members or close friends of Italian ancestry. The percentage of shareholder-employees decreased so that by 1978 only about one-quarter of the employees were shareholders. The number of shareholder-employees fell as well, from a peak of 208 in 1943 to approximately 135 by 1978. The number of shareholder-employees assigned to each garbage collection truck dropped from as many as four to at most one.
 
 
 6
 Since the Company is a "membership corporation," a person cannot buy shares in the Company without the approval of all the other shareholders. The shareholders' agreement, signed by every shareholder, provides that the share certificates remain in the custody and possession of the board of directors during the shareholder's life. When a shareholder dies, title to his shares passes to the board. The board then issues a new certificate to a suitable surviving child or relative, if one is available. Every shareholder owns an equal block of 100 shares. He or she is required to be a full-time permanent employee of the Company. The shares are not transferable without board permission, they are not publicly traded, and there are no outside investors in the Company. Every new shareholder-employee has either a relative or a close friend who is a shareholder-employee in the Company. Since May 1968 all new shareholder-employees have been children or, in one case, a son-in-law of shareholder-employees. The shareholder agreement is discussed more fully in Perata v. Oakland Scavenger Co., 111 Cal.App.2d 378, 244 P.2d 940 (1952).
 
 
 7
 There are basically three nonmanagerial types of jobs in the Company: head route drivers, single route drivers, and helpers. The head route drivers have some additional responsibilities, and they receive a wage premium of $5.00 more per day than helpers. Single route drivers receive $2.50 to $3.50 more per day than helpers. All drivers are guaranteed nine and one-half paid hours per day. Helpers generally receive no more than eight paid hours per day.
 
 
 8
 Under the shareholder preference plan, the board of directors has the right to assign the preferred driver positions to shareholder-employees. As a result, in 1978 there was only one shareholder-employee who was a helper. All other shareholder-employees were either drivers or members of management.
 
 
 9
 The nonshareholder-employees first joined Local 70 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers in February 1967. Since then, a series of three-year collective bargaining agreements between the Company and the Union has been in effect. Some time after the original organization, the nonmanagerial shareholder-employees joined the Union to protect their preferred driver jobs. The collective bargaining agreement incorporated and preserved the shareholder-employees' right of assignment, which permits the shareholder-employees to assign the preferred and higher paying driver jobs to themselves, regardless of the seniority of any nonshareholder-employee. The jobs not filled with shareholder-employees by the right of assignment went to the senior qualified bidder among the other employees.ANALYSIS
 
 
 10
 I. Discrimination Between White and Minority Nonshareholder-Employees
 
 
 11
 The first count of the original plaintiffs' first amended complaint, which was incorporated into the intervening plaintiffs' subsequent complaint, alleged that the Company discriminated against minority nonshareholder-employees in terms of wages and job assignments. The district court did not specifically discuss this claim when it dismissed the plaintiffs' cause of action for failure to state a claim upon which relief could be granted.
 
 
 12
 The Company had filed, among other pleadings, a motion to dismiss under Fed.R.Civ.P. 12(b)(6) for failure to state a valid claim, along with a motion for summary judgment under Fed.R.Civ.P. 56(b). The district court considered evidence extraneous to the pleadings before granting the Rule 12(b)(6) motion to dismiss. As the Company concedes on appeal, this was error. We have held that a district court commits reversible error when it considers matters extraneous to the pleadings while treating the motion as one to dismiss, rather than as one for summary judgment. See Costen v. Pauline's Sportswear, Inc., 391 F.2d 81, 84-85 (9th Cir. 1968); see also Carter v. Stanton, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972); Williams v. Pacific Maritime Ass'n, 384 F.2d 935, 936 (9th Cir. 1967), cert. denied, 390 U.S. 987, 88 S.Ct. 1181, 19 L.Ed.2d 1290 (1968); Fed.R.Civ.P. 12(b).
 
 
 13
 The allegation of discrimination against minority nonshareholder-employees states a valid basis for seeking relief under Title VII, Griggs v. Duke Power Co., 401 U.S. 424, 429-31, 91 S.Ct. 849, 852-853, 28 L.Ed.2d 158 (1971), and Section 1981, Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 459-60, 95 S.Ct. 1716, 1719-1720, 44 L.Ed.2d 295 (1975). See Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30, 694 F.2d 531 (9th Cir. 1982).
 
 
 14
 The plaintiffs are entitled to an opportunity to establish a prima facie case of disparate treatment between white and minority nonshareholder-employees. Disparate treatment arises when an
 
 
 15
 employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment....
 
 
 16
 International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335-36 n.15, 97 S.Ct. 1843, 1854 n.15, 52 L.Ed.2d 396 (1977).
 
 
 17
 On remand the plaintiffs should be given an opportunity to meet their initial burden of proving by a preponderance of the evidence a prima facie case of disparate treatment. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The plaintiffs' threshold burden is not onerous, id. at 253, 101 S.Ct. at 1093, and will be satisfied if they introduce evidence
 
 
 18
 showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under [Title VII]."
 
 
 19
 Furnco Construction Corp. v. Waters, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting Teamsters, 431 U.S. at 358, 97 S.Ct. at 1866 [footnote omitted]. The statistical evidence supplied by the parties is not sufficiently reliable for us to decide at this stage whether the plaintiffs have established a prima facie case of disparate treatment among the nonshareholder-employees on the basis of race and national origin.
 
 
 20
 If the plaintiffs meet their initial burden, the burden of production will shift to the Company "to articulate some legitimate, nondiscriminatory reason" for the disproportionately low number of minority employees in the preferred driver positions. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093, quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The Company can meet this burden by offering sufficient admissible evidence to raise a genuine issue of fact as to whether it unlawfully discriminated among the nonshareholder-employees on the basis of race and national origin. 450 U.S. at 254-55, 257, 101 S.Ct. at 1094, 1095.
 
 
 21
 If the Company meets this burden, the burden of production will shift back to the plaintiffs and merge with their ultimate burden of persuading the court that the Company's asserted justification was not its true reason, but merely a pretext for discrimination. Id. at 253, 256, 101 S.Ct. at 1093, 1095.
 
 
 22
 The district court's failure to follow these steps was error.
 
 
 23
 A Title VII plaintiff may also merit relief upon a showing of disparate impact. However, the disparate impact theory of proving discrimination is unavailable in this case if the evidence supports the Company's allegation that the racial imbalance among the nonshareholder-employees in the preferred jobs is due to a facially neutral bona fide seniority system. Because Section 703(h) of the Act exempts from Title VII bona fide seniority systems, "a showing of disparate impact is insufficient to invalidate a seniority system, even though the result may be to perpetuate pre-Act discrimination." Pullman-Standard v. Swint, 456 U.S. 273, 277, 102 S.Ct. 1781, 1784, 72 L.Ed.2d 66 (1982). Rather, the plaintiffs must in addition show that the Company adopted the system specifically because of its discriminatory impact. "As Sec. 703(h) was construed in Teamsters, there must be a finding of actual intent to discriminate on racial grounds on the part of those who negotiated or maintained the system." Id. at 289, 102 S.Ct. at 1790.
 
 
 24
 It would also have been error to grant the Company's motion for summary judgment. Viewed in the light most favorable to the plaintiffs and read as a whole, the pleadings, affidavits, and depositions raise a genuine issue of fact as to whether the Company intended to prefer white nonshareholder-employees over black and Spanish-surnamed nonshareholder-employees.
 
 
 25
 Upon the record before us, the plaintiffs are entitled to a trial on the merits on this allegation of discrimination.
 
 
 26
 II. Discriminatory Effect of the Company's Shareholder Preference Plan
 
 
 27
 The plaintiffs also charge that the Company's shareholder preference plan illegally discriminates against black and Spanish-surnamed employees (1) in assigning the better jobs with higher pay and more guaranteed hours to the shareholder-employees, who were exclusively of Italian ancestry, and (2) by limiting share ownership to persons who were of Italian ancestry and were either members of the family or close friends of a current shareholder.
 
 
 28
 The Company argues that Title VII has no application to discrimination in the sale of corporate stock. Even if this is so, however, it does not help the Company's position here. Since the Company ties preferential wages, hours, and job assignments to ownership of its stock, the shareholder preference plan constitutes a condition of employment subject to the mandate of Title VII. The Company's organization closely entangles stock ownership and employment privilege, but the predominant characteristics are those of employment. The Company describes itself as a "membership corporation." At least a quarter of its employees are stockholders, each of whom binds himself or herself under the bylaws and stockholders' agreement to permanent, full-time employment. Stockholders also agree not to withdraw from employment without the express consent of the board of directors. The stock is not freely transferable: Upon the death of a stockholder, his or her shares vest in the board, which then issues them to a successor. Each stockholder owns an equal interest in the company, represented by a block of 100 shares. The shareholders never possess their share certificates, as they are retained by the board of directors. While we decline to lay down an all-encompassing rule, under these circumstances the admittedly discriminatory employment practices of the Company are within the reach of Title VII in spite of the effort to characterize those practices as "proprietory rights."
 
 
 29
 Having found Title VII applicable, we analyze the claim of discrimination under the disparate impact theory articulated by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). As the Company concedes, the shareholder preference plan, while neutral on its face, has a discriminatory impact on the Company's minority employees. In situations such as this, where a facially neutral employment practice, plan, or procedure has a disproportionately adverse effect on minorities, discriminatory intent need not be demonstrated. See, e.g., International Brotherhood of Teamsters v. United States, 431 U.S. 324, 349 n.32, 97 S.Ct. 1843, 1861 n.32, 52 L.Ed.2d 396 (1976); Gibson v. Local 40, Supercargoes & Checkers of the International Longshoremen's and Warehousemen's Union, 543 F.2d 1259, 1268 (9th Cir. 1976).
 
 
 30
 Because the disparate impact of the shareholder preference plan is clear, the burden shifts to the Company to demonstrate that legitimate and overriding business considerations provide justification. See, e.g., Albermarle Paper Co. v. Moody, 422 U.S. 405, 425-35, 95 S.Ct. 2362, 2375-2380, 45 L.Ed.2d 280 (1975); Contreras v. City of Los Angeles, 656 F.2d 1267, 1275-80 (9th Cir. 1980), cert. denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). To meet this burden, the Company points to an allegedly superior interest in protecting and providing for members of the immediate families of the founders of the Company. But Title VII case law has from the beginning made clear that nepotistic concerns cannot supersede the nation's paramount goal of equal economic opportunity for all.
 
 
 31
 The issue has most frequently arisen in the context of nepotistic preferences for union membership. In Local 53 of the International Ass'n of Heat and Frost Insulator & Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969), the Fifth Circuit held that, "[i]n pursuing its exclusionary and nepostistic policies, Local 53 engaged in a pattern and a practice of discrimination on the basis of race and national origin both in membership and referrals." Id. at 1050. The court noted that "[w]hile the nepotism requirement is applicable to black and white alike and is not on its face discriminatory, in a completely white union the present effect of its continued application is to forever deny to negroes and Mexican-Americans any real opportunity for membership." Id. at 1054.
 
 
 32
 The Fourth Circuit followed Vogler in a similar case involving a nepotistic employment preference, rejecting the union's reliance on a constitutional right to pursue a livelihood:
 
 
 33
 The desire of a union to insure family security by restricting new membership to the sons and close relatives of present members may constitute a legitimate "business purpose." But it cannot override the racial impact where present union membership is all-white.
 
 
 34
 Robinson v. Lorillard Corp., 444 F.2d 791, 798 n.5 (4th Cir. 1971).
 
 
 35
 These cases are consistent with the Supreme Court's admonishment that under Title VII, "practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." Griggs, 401 U.S. at 430, 91 S.Ct. at 853. We cited Griggs in Gibson, supra, where we held that an employer's discriminatory practice of assigning jobs partly on the basis of nepotism violated Title VII. 543 F.2d at 1268. Other courts have continued to prohibit nepotistic practices which adversely affect minorities by freezing the discriminatory status quo. See, e.g., Grant v. Bethlehem Steel Corp., 635 F.2d 1007, 1019 (2d Cir. 1980); Domingo v. New England Fish Co., 445 F.Supp. 421, 435-36 (W.D.Wash.1977).
 
 
 36
 We reject the Company's argument that its legitimate interest in protecting its family members overrides the countervailing national interest in eliminating employment discrimination based on race and national origin. To the extent that preferential wages, hours, and job assignments are tied to ownership of the Company's stock, the shareholder preference plan violates Title VII because the plan's effect is
 
 
 37
 to discriminate against [plaintiffs] with respect to [their] compensation, terms, conditions, or privileges of employment because of [their] race, color, ... or national origin.
 
 
 38
 42 U.S.C. Sec. 2000e-2(a).
 
 
 39
 We emphasize that our decision by no means interferes with the capacity of the proprietors of a small family-owned business, or, for that matter, any small business, to conduct its affairs with heightened solicitude toward family or friends. In enacting Title VII, Congress specifically exempted employers with twenty-five or fewer employees from its coverage. Civil Rights Act of 1964, Pub.L.No. 88-352, 78 Stat. 253, Title VII, Sec. 701(b) (codified as amended at 42 U.S.C. Sec. 2000e(b)). In 1972 Congress amended the section to exclude from coverage employers with fifteen or fewer employees, Equal Employment Opportunity Act of 1972, Pub.L.No. 92-261, 86 Stat. 103, Sec. 2(2) (currently codified at 42 U.S.C. Sec. 2000e(b)), though the House version of the bill had originally suggested an even lower threshold. See H.R.Rep. No. 238, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. & Ad.News 2137, 2155, 2161. The inclusion of this provision demonstrates Congress's due regard for the special concerns of smaller businesses. Here, however, we deal with an enterprise employing nearly 500 people. The "family" consists of more than 100 members and at one time included as many as 208. We will not dilute Title VII's imperative by altering the balance Congress has already struck.
 
 
 40
 We need not decide whether a restriction on the ability to purchase or own the Company's shares in and of itself would also violate Title VII. We note in passing that under this unusual share ownership plan, the payment of dividends might be equivalent, for purposes of Title VII, to the payment of a wage premium. Every shareholder must be of Italian ancestry. The distribution of dividends to this group of preferred employees might be no different than the payment of a wage premium to the same group of employees and might therefore violate Title VII. We reserve ruling, however, since neither the issue nor the evidence is squarely before us.
 
 
 41
 We reverse the district court's dismissal and remand for a hearing on whether there is any other justification for this discriminatory practice.
 
 III. The Plaintiffs' Claim Against the Union
 
 42
 The plaintiffs charged the Union with breaching its duty of fair representation by including the shareholder preference plan and right of assignment in the collective bargaining agreement.
 
 
 43
 The district court failed to address this claim. On remand the court should do so.
 
 
 44
 Title VII and Section 1981 prohibit discrimination by unions to the same extent they prohibit discrimination by employers. McDonald v. Sante Fe Transportation Co., 427 U.S. 273, 284-85, 96 S.Ct. 2574, 2580-2581, 49 L.Ed.2d 493 (1976). The union has an affirmative obligation to oppose employment discrimination against its members. If instead it acquiesced or joined in the Company's discriminatory practices, it too is liable to the injured employees. Id.; Kaplan v. International Alliance of Theatrical and Stage Employees and Motion Picture Operators, 525 F.2d 1354, 1360 (9th Cir. 1975); Macklin v. Spector Freight Systems, Inc., 478 F.2d 979, 989 (D.C.Cir.1973).
 
 
 45
 REVERSED AND REMANDED.
 
 
 
 *
 Honorable Shiro Kashiwa, Circuit Judge, United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 [1]
 Title VII provides, in relevant part:
 (a) It shall be an unlawful employment practice for an employer--
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 42 U.S.C. Sec. 2000e-2.
 
 
 [2]
 Section 1981 provides in relevant part:
 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens ....
 42 U.S.C. Sec. 1981.
 
 
 [3]
 The claim that the Union breached its duty of fair representation by not representing the former employee during a grievance proceeding is moot. The former employee settled his claims against the Union and the Company
 Plaintiffs found their complaint against the union on the National Labor Relations Act, 29 U.S.C. Sec. 151 et seq. However, the more appropriate basis for this cause of action insofar as it relates to the inclusion of the shareholder preference plan in the collective bargaining agreement is Title VII, which provides in relevant part:
 (c) It shall be an unlawful employment practice for a labor organization--
 (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
 (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or
 (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.
 42 U.S.C. 2000e-2; see Section III, infra.
 
 
 [4]
 The district court stated, in relevant part:
 Plaintiffs have failed to state a claim that is cognizable under Section 1981 or Title VII....
 Section 1981 prohibits racial discrimination in the making and enforcement of contracts. Plaintiffs have alleged that they were excluded from ownership of Oakland Scavenger Company stock on the basis of race and national origin in violation of their right to make and enforce contracts in the same manner which is enjoyed by white citizens generally. While it is clear that Section 1981 extends to private conduct as well as state action, Johnson v. Railway Express Agency, 421 U.S. 454, 459-561 [95 S.Ct. 1716, 1719-1720, 44 L.Ed.2d 295] (1975), the Supreme Court has limited its application in at least one significant respect. It is not applicable to "truly private" organizations, where there is a "plan or purpose of exclusiveness" other than race. Tillman v. Wheaton-Haven Recreation Ass'n, Inc., 410 U.S. 431, 439 [93 S.Ct. 1090, 1094, 35 L.Ed.2d 403] (1973); Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 237 [90 S.Ct. 400, 404, 24 L.Ed.2d 386] (1969). In the instant case all sales of stock during the applicable period of limitations were to sons, and in one case the son-in-law of existing stockholders, or to the Oakland Scavenger Company itself.... The stock was not advertised nor was it publicly offered in any way. Choices that are not part of a commercial relationship that is offered generally or widely were not intended to be within the scope of the Act. Runyon v. McCrary, 427 U.S. 160, 190 [96 S.Ct. 2586, 2604, 49 L.Ed.2d 415] (1976).
 Having established that on the facts presently before the Court Section 1981 does not prohibit the private unadvertised sale of Oakland Scavenger Company stock, it is apparent that plaintiffs have failed to state a claim under Title VII as well .... Plaintiffs have cited no authority, and apparently none exists, which would demonstrate that the shareholders of the Oakland Scavenger Company may not exercise their proprietary preference and reserve for themselves and their families the most attractive and highest paying positions. The right to hold specific private employment and to follow a specific private profession free from unreasonable governmental interference comes within the "liberty" and "property" concepts of the Fifth Amendment of the United States Constitution. Green [Greene] v. McElroy, 360 U.S. 474, 492 [79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377] (1959). Similarly, an individual cannot be precluded from pursuing any lawful occupation in a manner inconsistent with due process or the equal protection of the laws. Schware v. Board of Bar Examiners, 353 U.S. 232, 238-239 [77 S.Ct. 752, 755-756, 1 L.Ed.2d 796] (1957). From this it follows that the stockholders of the Oakland Scavenger Company have the right to employ themselves and their families at whatever position and salary they can afford.
 Accordingly, the defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6) is hereby granted.