Perfecto **MARTINEZ**, et al., Plaintiffs,

v.

**OAKLAND SCAVENGER COMPANY,**
**et al., Defendants.**

**Joaquin Morales BONILLA, et al.,**
**Plaintiffs-in-Intervention,**

v.

**OAKLAND SCAVENGER COMPANY,**
**et al., Defendants.**

**No. C–75–0060–CAL.**

United States District Court,
N.D. California.

Dec. 28, 1987.

---

Gunheim & Yturbide, B.V. Yturbide, San Francisco, Cal., for intervenors.

Krause, Baskin, Shell, Grant & Ballentine, Larkspur, Cal., Associated Counsel for intervenors.

Brundage, Beeson, Tayer & Kovach, San Francisco, Cal., for defendant Teamsters Local 70.

Carol A. Malenka, Stephen McKae, Hardin, Cook, Loper, Engel & Bergez, Oakland, Cal., for Oakland Scavenger Co.

### OPINION AND ORDER

LEGGE, District Judge.

Plaintiffs charge defendants Oakland Scavenger Company and Teamsters Local

70 with employment discrimination in violation of Title VII (42 U.S.C. § 2000e et seq.) and 42 U.S.C. § 1981.

The charges focus on tensions among racial and ethnic minorities in achieving the "American Dream" of business success. The company was begun by persons of Italian ancestry doing work which the rest of society did not want, collecting garbage. By virtue of hard work and good management, the enterprise expanded and prospered. The ethnic group which created and developed it became successful. But as the enterprise grew, it required additional manpower. So the Italians who controlled it have hired other ethnic minorities at the bottom of the economic ladder, Blacks and Hispanics. As these new minorities have become larger within the company, they too have sought the benefits of the better jobs and of the success of the enterprise. Because these benefits have been denied to them, they turn to the courts.

One might question the wisdom of laws compelling one minority group to share the fruits of its years of hard work with other minorities. But Congress resolved that question when it passed Title VII. Congress' wisdom is that America is best served by equality of employment opportunity, regardless of what group got there first. And the court of appeals for this circuit has already decided that that principle must be applied to this enterprise. *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297 (9th Cir.1982) *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 838 (1984).

It is therefore the responsibility of this court to apply that principle to the facts which were disclosed at trial. Those facts compel this court to conclude that the new minorities must now share in the employment opportunities which the old has created.

## I.

### HISTORY OF THE CASE

This action began in 1975, when a group of Black and Hispanic employees filed an individual and class action suit alleging discrimination. The initial group of plaintiffs settled their claims. Sixteen Hispanic and Black employees were then allowed to intervene as plaintiffs.

The district judge to whom this case was originally assigned dismissed the action under Fed.R.Civ.P. 12(b)(6). In the order of dismissal, the district judge found that plaintiffs had failed to state a claim either under 42 U.S.C. § 1981 or under Title VII. *See id.*, 697 F.2d at 1299 n. 4. The dismissal focused on the fact that employment benefits were tied to stock ownership in the company. The district court concluded that the private sale of stock in the company by one employee to another employee was a "truly private" activity beyond the reach of Section 1981. The district court also held that no claim was stated under Title VII, because the company's shareholders had Fifth Amendment property rights to employ and compensate themselves as they saw fit. Plaintiffs appealed, and the Ninth Circuit reversed and remanded in *Bonilla v. Oakland Scavenger Co., supra.*

The Ninth Circuit disagreed with the district court on both grounds for its decision. Applying the usual Title VII analysis, the court of appeals held that plaintiffs had properly alleged intentional discrimination, under a disparate treatment theory and under Section 1981. *Id.* at 1301. The district court was directed to follow the method of proof set out in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and other disparate treatment cases. *Id.* at 1301–02.

The Ninth Circuit also considered plaintiffs' disparate impact allegations, and concluded that various features of the company's shareholder rights were conditions of employment which are subject to the mandates of Title VII. *Id.* at 1302. The court explicitly rejected the company's attempt to justify the challenged employment practices as being merely the permissible consequences of owning stock. In finding that Title VII is applicable, the Ninth Circuit necessarily rejected the argument that the company's shareholders had a Fifth Amendment property right to be free from

Title VII's requirements. The court also rejected nepotism as a possible defense. *Id.* at 1303–04.

Finally, the appellate court instructed the district court to address plaintiffs' charges against Teamsters Local 70 for allegedly breaching its duty of fair representation. *Id.* at 1304. The court said that a union can be liable under Title VII and Section 1981 if it acquiesces or joins in the employer's discrimination.

Following remand, this court defined and ordered a conditional plaintiff's class, consisting of ".... All Black and all Hispanic surnamed persons who on or after January 10, 1972, have been employees of defendant Oakland Scavenger Company." After hearing the evidence at trial, this court modifies that class definition as discussed in section X below.

The parties stipulated that the issues of liability would be prepared and tried before the issues of remedies. Following pretrial procedures, the liability portion of the case was then tried before this court sitting without a jury. The trial lasted over a period of three months, and the court heard approximately forty witnesses and admitted several hundred pages of exhibits into evidence. Post-trial briefs were then filed, and the case was argued and submitted.

The court has considered the record, the exhibits, the testimony of the witnesses, the arguments of counsel, and the applicable authorities. The court now issues this opinion, which also constitutes the findings of fact and conclusions of law as provided in Fed.R.Civ.P. 52(a). The factual statements made in this opinion are the facts that are found by this court, using the appropriate burdens of persuasion and burdens of going forward with the evidence that are discussed below.

## II.

## THE COMPANY

Oakland Scavenger Company was founded in 1909 by independent garbage collectors in Oakland, California. The present company was incorporated in 1920. Shortly thereafter, the company was enlarged by the joining of virtually all garbage collectors in Oakland and Berkeley. All of the initial owners were of Italian ancestry, and the Italian heritage has continued.

Initially, all who worked for the company became equal partners or shareholders. All received the same compensation, regardless of their jobs. As a condition to having an ownership interest, all shareholders worked actively in the company, work which involved collecting garbage, soliciting business, collecting accounts, managing the business, and other scavenger-related work.

By 1943, the company had 208 shareholders. Shares were not publicly traded. One became a shareholder by working for the company and purchasing the ownership share of a retiring shareholder. Shares were sold only with the approval of the board of directors. In practice, shares were sold only to relatives or to other members of the Italian–American community. And relatives or Italian–Americans who began work for the company and continued to work successfully, could usually look forward to the opportunity of share ownership at some time.

The company in essence operated as an expanded "partnership" of its workers. As it grew, the company gradually evolved from that partnership concept into its present organizational structure, which is a hybrid of a partnership and a modern corporation.

By the end of World War II, the company and its business had expanded. The company started to employ outsiders, *i.e.* non-relatives and non-Italians, to work on the garbage trucks. The new employees began as helpers. Helpers who were relatives of shareholders might later acquire the opportunity to purchase shares. Non–Italian helpers, largely Blacks and Hispanics, did not have the opportunity to become shareholders. And as discussed below, the better jobs in the company were tied to share ownership.

In 1967 Teamsters Local No. 70 first organized the company's employees. The bargaining unit was initially comprised

only of employees who were not shareholders, but subsequently shareholders were brought into the bargaining unit and became members of Local 70. The first collective bargaining agreement was signed in 1967 and the agreement, with modifications, has been renewed ever three years since then.

## III.

### THE COMPANY'S WORK FORCE

Since 1972, the date relevant to this lawsuit, the company's work force has been organized essentially as follows.

### Shareholders

The quasi-corporate structure of the company has not diminished the central position that its "shareholders," "owners," or "partners" have continued to occupy in its work force. The company is owned by its shareholders, all of whom must work full-time for the company. Shareholders do manual labor. But they also have active roles in the management of the company, and only shareholders can serve as officers, managers (with limited exceptions), and on the board of directors. Shareholders have also enjoyed other job-related privileges and have certain duties not shared by other employees, as discussed below.

The number of shareholders has been restricted in recent years. Company policy[1] now provides that the company will itself purchase the shares of a retiring shareholder, unless that shareholder has a son or daughter who desires to purchase the retiree's shares and work for the company. As a result, the number of shareholders decreased from 208 in 1943 to 122 presently.

Since the formation of the company, no shares have ever been owned by a Black or Hispanic person. The only exception was one Hispanic, who became a shareholder because he was the son-in-law of a shareholder.

Very recently, the company's shares were acquired by Waste Management Corporation, and the company is being restructured as a result of that acquisition. However, because of the time period involved in this suit, 1972 to 1986, that acquisition has no effect on the liability issues in this case, and will be disregarded except with respect to later consideration of injunctive relief.

### Officers, Directors, and Managers

The officers and directors have been elected by the shareholders, and the board has then chosen the persons to hold the positions of managers. There have generally been nine directors, four corporate officers, and approximately thirty managers and assistant managers. With the exception of the office manager and four other staff professionals, all of the company's managers, directors and officers have been shareholders. None has been Black or Hispanic.

### Teamsters Local 70 Bargaining Unit

The largest number of the company's employees work in the collection and transportation of garbage. These employees and their jobs essentially comprise the collective bargaining unit under the Teamsters Local 70 contract.

Garbage is collected and transported in essentially four types of operations: residential, container box, drop box, and transfer. Residential service is provided by a crew of two or three persons operating a garbage truck. The person in charge of each truck is the head route driver (HRD). He has responsibilities for picking up the truck each morning, dumping it later, returning it after work, maintaining the collection route book, and doing some bill collecting. The other crew members are the helpers, who load garbage onto the truck and maneuver the truck along its route. Container boxes are used primarily by commercial customers. They are deposited and collected by the company with trucks

---

**1.** The company's by-law amendments regarding the sale of shares, and the history of its policies regarding sales, were unclear from the evidence. However, it is clear that in fact the board of directors (a) has exercised the power to approve or disapprove of the sale of shares, and (b) has not always followed the language of its by-laws or stated policies.

known as "front end loaders." A single employee will drive and operate a front end loader (FELD) on each commercial route. Drop box service is also provided to customers from trucks operated by a single driver. Finally, some employees work at or out of the company's transfer station. The transfer station is where garbage from the collection trucks is dumped, transferred into tractor trailers, and then driven to a landfill. The Local 70 collective bargaining unit encompasses essentially all of those jobs, and it includes both shareholders and nonshareholders who are involved in the collection and transport of garbage.

The driver positions have generally been the best paid and most desired jobs in the work force. By virtue of the collective bargaining agreement in 1973, nonshareholders began to acquire positions as drivers, rather than being just helpers. Helpers could become permanent drivers—either HRD, FELD, drop box driver, or transfer driver—in one of three ways. (1) The collective bargaining agreement provided that helpers could *bid* for driver positions, which would then be awarded ostensibly on the basis of seniority. (2) The company retained the right to assign shareholders to HRD positions without regard to seniority. (3) Although not defined by the collective bargaining agreement, HRD positions could also be filled by appointing the "back-up" driver, *i.e.* the crew member with the highest seniority on a particular route, to the HRD position on that route. The right of assignment and the back-up appointments applied only to HRDs and not to the other driver positions.

### Casual Pool

To fill needed jobs each day, the company used a so-called "casual pool" of temporary employees. Persons who desired jobs reported to the company offices each morning and were selected to fill the vacancies that occurred on that day. Casual pool employees who worked a certain number of days became regular employees of the company and members of Local 70. As well as providing a backup work force, the casual pool was therefore also a mechanism used for hiring permanent employees. Which casual pool members got work on a particular day, and how often they were employed, were decisions entirely within the discretion of the company's dispatchers. Casual pool employees are members of the class defined in this case.

### Other Employees

Certain other employees of the company have been members of East Bay Automotive Machinist Lodge No. 1546. These employees maintain and repair equipment. Two shareholders have supervised approximately 47 employees performing this work.

At its landfill, the company has also employed members of the Warehousemen's Local No. 6 and other nonunion employees. Shareholders have served as managers and assistant managers at the landfill. Local 6 employees have also been employed at the company's recycling facility.

In addition, the company has employed approximately 106 clerical and administrative employees, including a few professionals with specialized skills, such as accounting, which the shareholders may not have. The clerical and administrative employees have not been unionized. The office manager is the only manager within the company who is not a shareholder.

### Ethnic Composition

During the period covered by this action, 1972–1986, the Oakland Scavenger work force has been comprised of 61 to 62 per cent Caucasians, 12 to 14 per cent Blacks, and 25 to 26 per cent Hispanics.

The following was the racial composition of employees holding the HRD positions in four representative years:

| Year | White % | Black % | Hispanic % |
|------|---------|---------|------------|
| 1973 | 100 | 0 | 0 |
| 1977 | 97 | 0 | 3 |
| 1981 | 90 | 4 | 6 |
| 1986 | 82 | 5 | 13 |

The racial composition of FELDs during the period was as follows:

| Years | White % | Black % | Hispanic % |
|-------|---------|---------|------------|
| 1972–84 | 100 | 0 | 0 |
| 1986 | 91 | 3 | 6 |

The racial composition of helpers during the period was:

| Year | White % | Black % | Hispanic % |
|------|---------|---------|------------|
| 1978 | 36 | 24 | 40 |
| 1977 | 46 | 21 | 33 |
| 1981 | 47 | 20 | 33 |
| 1986 | 52 | 19 | 29 |

As stated, none of the shareholders, directors, officers or managers was Black or Hispanic.

## IV.

## COMPENSATION

The compensation of the company's employees, even under the collective bargaining agreement, has been different depending upon whether an employee was a shareholder or not a shareholder.

Shareholder HRDs and FELDs have allegedly performed "proprietary duties" in addition to the duties performed by other drivers. That term was coined to describe certain duties—collection of accounts, maintenance of collection records, maintenance of route books, and resolution of customer complaints—that shareholder employees traditionally performed since the early days of the company. In the last twenty years, however, increased automation and centralized billing have virtually eliminated those duties from the HRD and FELD positions.

Nevertheless, in compensation for those allegedly extra duties, shareholder HRDs and FELDs received a premium hourly rate for each hour worked; that is, a higher rate of hourly pay than was paid to nonshareholders holding the same jobs. That higher rate had no direct correlation to the actual work done by the shareholders. The higher rate became a largely unearned wage premium for those employees who were shareholders.

Shareholders were also paid for one and one-half hours of overtime each day, regardless of whether that time was actually worked or not. Again, the reasons for that differential were historical. But the reasons became no longer meaningful as the company grew and became automated.

By the combination of the premium hourly wage rate and the guaranteed overtime, shareholder HRDs and FELDs (none of whom were Black or Hispanic) earned an average of 48 per cent more than nonshareholders (who were largely Blacks and Hispanics) in the same jobs.

## V.

## KEY FACTS

This court is of the opinion that certain key facts have been established by the evidence, and that those key facts, together with others discussed later in this opinion, compel a decision for plaintiffs and against the company. Those key facts are:

1. The best jobs in the company were overwhelmingly held by whites, for reasons which were not justified by racially neutral employment considerations.

2. The shareholder employees, who were all white, got (a) higher pay and (b) guaranteed overtime, for the same work as that being performed by the minority employees.

3. No minority employee had the opportunity to become a shareholder, and hence to have access to the better jobs and higher pay.

4. The company's system of bidding for jobs was riddled with exceptions, which were used for the benefit of the white employees.

5. The casual pool was operated in a discriminatory manner.

6. There were numerous acts of intentional racial discrimination, which created a racially discriminatory atmosphere within the company.

## VI.

## THE APPLICABLE STATUTES

Plaintiffs allege that defendants have discriminated against Black and Hispanic employees in violation of Title VII and Section 1981.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a), provides in relevant part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex or national origin.

Section 1981 provides in relevant part:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens....

Liability under Title VII can be established under two theories—disparate treatment or disparate impact. To establish liability under Section 1981, plaintiffs must meet the same standard that applies in a disparate treatment Title VII claim, *i.e.* show intentional discrimination. *E.E.O.C. v. Inland Marine Industries*, 729 F.2d 1229, 1233 n. 7 (9th Cir.1984), *cert. denied.* 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984). Accordingly, liability under the disparate treatment theory of Title VII and under Section 1981 will be discussed together.

■ In their disparate treatment claims, plaintiffs must show that an employer intentionally "treats some people less favorably than others because of their race, color, religion, sex, or national origin." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Intentional discrimination must be proved. But in cases such as this alleging a class-wide discrimination, so-called "pattern and practice" cases, intentional discrimination may be proved from a sufficient showing of disparity between members of the minority class and comparable members of the majority group. *Id.; Segar v. Smith*, 738 F.2d 1249, 1265–66 (D.C. Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985).

■ In their disparate impact claims, plaintiffs challenge "employment practices that are facially neutral in their treatment of different groups, but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters*, 431 U.S. at 336 n. 15, 97 S.Ct. at 1854 n. 15. Proof of an intentionally discriminatory motive is not required in disparate impact cases, as discriminatory effect is also prohibited by Title VII. *Griggs v. Duke Power Co.*, 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971).

Plaintiffs here charge that defendants are liable under both the disparate impact and the disparate treatment theories. Under the disparate impact theory, plaintiffs challenge a number of employment practices which will be discussed below. Under the disparate treatment theory, plaintiffs charge that the numerous disparities in treatment between the minorities and the whites, as well as direct evidence of discrimination, compel a conclusion of intentional discrimination.

## VII.

### DEFENSES

As to some of the practices which plaintiffs challenge, the company does not dispute that disparities have existed between whites and minorities. Instead, the company raises certain fundamental defenses as to why Title VII and Section 1981 should not apply at all. It argues that certain of the challenged practices are not "employment practices" that are within the scope of Title VII. The company also contends that Title VII may not infringe on certain of the rights which some of the company's employees have by virtue of being shareholders. It also argues that it can not be liable under Section 1981 if it discriminates in favor of persons of Italian ancestry, rather than against the plaintiff minorities.

If the company is correct in these contentions, then the statutes do not apply to this case. And the company cannot be liable for practices which are outside the scope of the statutes, or which are constitutionally protected. Accordingly, the court will first discuss the applicability of Title VII and Section 1981 to the challenged practices, and whether the company's actions are constitutionally protected. To the extent that Title VII or Section 1981 are found to be applicable, the court will discuss disparate impact, disparate treatment, and the other alleged defenses to those claims.

### Applicability of Title VII

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). In this case plaintiffs charge that numerous employment practices discriminate against Black and Hispanic employees. Those practices are allegedly discriminatory (1) between the shareholders (who are all white) and the nonshareholders (who are mostly minorities), and (2) between white and minority nonshareholders.

The challenged practices include: the premium wage rate paid to shareholders; the guaranteed overtime paid to shareholders; the right of assignment; the appointment of the back-up drivers; the operation of the bidding system; the exclusion of minorities from management positions; the exclusion of minorities from the opportunity to purchase stock; preferential assignments of work and routes; permission to take leaves of absence; the operation of the casual pool; and the handling of grievances under the collective bargaining agreement.

Some of those practices are ones which the whites receive because of their stock ownership. The company argues here, as it did before the Ninth Circuit, that the benefits which accompany stock ownership are not "terms, conditions, or privileges of employment" within the coverage of Title VII. *See Bonilla,* 697 F.2d at 1302. In addressing this argument, the Ninth Circuit focused on what it called the "shareholder preference plan," which included the right of assignment, the guaranteed overtime for shareholders, and the premium wage rate for shareholders. The Ninth Circuit squarely held that the practices encompassed by the shareholder preference plan were conditions of employment subject to Title VII. The court stated:

"Since the Company ties preferential wages, hours, and job assignments to ownership of its stock, the shareholder preference plan constitutes a condition of employment subject to the mandate of Title VII. The Company's organization closely entangles stock ownership and employment privilege, but the predominant characteristics are those of employment."

*Bonilla,* 697 F.2d at 1302. This court is of course bound by that decision, and it must here find that job-related discriminations are subject to the prohibitions of Title VII, even if the discriminations are a consequence of stock ownership.

The Ninth Circuit did not reach the issue of whether the opportunity to *purchase* shares in the company is a term, condition, or privilege of employment which is subject to Title VII. *Id.* at 1304: "We need not decide whether a restriction on the ability to purchase or own the Company's shares in and of itself would also violate Title VII." The Ninth Circuit did note that the payment of cash dividends to shareholders on the shares might be the equivalent of a wage premium which could violate Title VII. However, that equivalency was not proved at trial. The dividends paid on the shares were primarily a financial device, by which new shareholders were able to finance their purchase of shares.

Because of the allegations, evidence and prayer in this case, this court must now reach the issue of whether the opportunity to purchase shares in this company is an employment feature within the coverage of Title VII. This is an issue of first impression, so far unanswered by either Congress or the courts. The issue here arises in the context of this company's unique ownership structure, which has historically (1) linked share ownership with certain em-

ployment benefits, and (2) limited share ownership to working relatives and others approved by the board of directors.

Neither the language of the statute nor its legislative history resolves the issue. This court's only guidance is the U.S. Supreme Court's decision in *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). In *Hishon*, a female attorney in a law firm sued under Title VII after she was denied admission to partnership. The district court dismissed her complaint, holding that Title VII did not apply to the selection of partners. *Id.* at 72–73, 104 S.Ct. at 2232. The Supreme Court reversed, holding that plaintiff had alleged sufficient facts to support a conclusion that the opportunity to become a partner was a condition of her employment and thus subject to Title VII. Hishon had alleged that the opportunity to be considered for partnership was a provision of her employment contract. *Id.* at 74–75, 104 S.Ct. at 2233. In addition to the contractual allegations, Hishon also claimed that the opportunity to become a partner was part of an attorney's status with a law firm. *Id.* at 76, 104 S.Ct. at 2234.

While *Hishon* provides guidance, it does not resolve the issue before this court. First, *Hishon* merely held that plaintiff could allege a cause of action under Title VII. Hishon was still required to prove that advancement to partnership was in fact a condition of her employment. Second, the *Hishon* Court did not directly discuss whether Title VII extended to the right to *own* a portion of the employer's business in a corporate setting. Third, the opportunity for partnership was allegedly an expressed inducement to Hishon in deciding to work for that firm.

■ This court does not believe that the principles of *Hishon* or Title VII should be applied here. In a law firm, the right to be considered for partnership can historically be deemed a part of an attorney-employee's expectations in employment. But that has not been true in this company. As in most commercial enterprises, an employee's hiring or status does not include the right to become an owner of that enterprise. Here

the company made no express or implied promises to its employees that they would all become owners. Nor did the company offer the opportunity of stock ownership as an inducement in the hiring of its employees. The company granted the right of ownership to some—primarily relatives—but not to others; and not all whites were offered ownership. While a case could be hypothesized in which a company offers ownership to all white employees, but denies ownership to all minorities, which would then fall within the scope of Title VII, that is not the case here.

To the extent that the privilege of stock ownership then *resulted* in special employment benefits to whites over minorities, those employment benefits can and will be equalized under Title VII. But the court concludes that the opportunity to purchase stock is not in this case within the purview of Title VII, either as a cause of action or as a remedy for other employment discriminations.

### Applicability of Section 1981

■ Section 1981 protects the rights of all persons to make and enforce contracts, and to the full and equal protection of the laws "as is enjoyed by white citizens." The statute is construed to forbid all racial discrimination in the making of private as well as public contracts. *Saint Francis College v. Al–Khazraji*, —— U.S. ——, 107 S.Ct. 2022, 2026, 95 L.Ed.2d 582 (1987); *Runyon v. McCrary*, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976). In enacting Section 1981, "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis*, 107 S.Ct. at 2028.

The company here argues that these plaintiffs cannot state a claim under Section 1981 because the company has discriminated *in favor of* those of Italian ancestry, rather than discriminated *against* those of a particular race. That is, the company has not discriminated on the basis of race because non-Italian whites, as well as the plaintiff minorities, have been adversely af-

fected. The defect in this argument, in addition to the absence of pertinent authority to support it, is that Section 1981 affords protection to identifiable groups of non-whites. It is no defense to a charge of discrimination that the discrimination also impacted some members of the white race. This court believes that Section 1981 protects the contractual opportunities of affected non-whites, even if the intended distinctions were among classes of whites.

### Constitutional Defenses

Since this court concludes that Title VII and Section 1981 do apply to the company's employment practices, the company then argues that its practices are nevertheless constitutionally protected.

First, the company renews the same argument it made before the Ninth Circuit; that is, that its shareholders have a constitutional property right to employ themselves and their families under whatever conditions they desire. The prior district court decision accepted this argument in granting defendant's motion to dismiss. *Bonilla*, 697 F.2d at 1299 n. 4. In reversing that decision, the Ninth Circuit necessarily rejected defendant's property rights argument. *See id.* at 1302–04.

Second, the company argues that its shareholders have a constitutional right to restrict the sale of their shares to their children. However, since this court has already concluded above that Title VII and Section 1981 do not require this company to sell shares to plaintiffs, a discussion of that constitutional argument is unnecessary.

### Procedural Defenses

Defendants raised certain procedural defenses by motion at the beginning of the trial, and the court orally denied those motions. However, the court allowed the parties to brief those defenses further at the conclusion of trial, and the court now addresses those defenses.

A prerequisite to a Title VII action is compliance with the administrative procedures of the statute. *See,* 42 U.S.C. § 2000e–5(f)(1). Defendants argue that plaintiffs' claims must be dismissed be-cause of plaintiffs' failure to comply with those administrative requirements. The original plaintiffs had previously filed charges with the Equal Employment Opportunities Commission, and had received right-to-sue letters, as required by 42 U.S. C. § 2000e–5(f)(1) before filing this action. Of the sixteen intervenors, nine have filed charges with the EEOC but none has received a right-to-sue letter. The remaining seven intervenors have not filed charges with the EEOC.

However, it is now established that compliance with Title VII's administrative procedures is not a "jurisdictional" prerequisite to bringing an action in district court. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed. 2d 234 (1982) (statutory limitations period is not jurisdictional); *see generally, Jackson v. Seaboard Coast Line R. Co.,* 678 F.2d 992 (11th Cir.1982) (applying *Zipes* reasoning to hold that failure to properly name defendant in EEOC charge did not deprive the court of jurisdiction). The U.S. Supreme Court has also held that unnamed class members need not file EEOC charges in order for a class action Title VII suit to proceed. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 414, 95 S.Ct. 2362, 2370, 45 L.Ed.2d 280 (1975).

In cases such as this—where the original class representatives settled their individual claims—intervenors have been allowed to continue the action and rely on the administrative compliance of the original plaintiffs. *See, e.g., United Airlines, Inc. v. McDonald,* 432 U.S. 385, 389, 97 S.Ct. 2464, 2467, 53 L.Ed.2d 423 (1977) (original plaintiff settled individual claim after trial court denied class certification; intervenor allowed to appeal denial of class certification); *Wheeler v. American Home Products Corp.,* 582 F.2d 891, 897 (5th Cir.1977) (intervening plaintiff who had not complied with the statute's administrative preconditions allowed to replace original plaintiff, who had complied, when original plaintiff voluntarily dismissed the action).

The facts of this case provide an even stronger reason to allow the intervenors to

proceed and to rely upon the administrative compliance of their predecessors. In its order approving the settlements of the original claimants, the district court expressly provided that other plaintiffs would be allowed to intervene on behalf of the class.

This court also disagrees with defendants' arguments regarding plaintiffs' alleged lack of standing. The court concludes that plaintiffs-in-intervention have standing to assert the claims that are alleged in the complaint, and that they are adequate class representatives of the class as it is now defined in section X below.

## VIII.

### DISPARATE IMPACT

Plaintiffs charge that certain of the company's employment practices—enumerated on page 18 above—have a discriminatory impact and therefore violate Title VII. The method of inquiry and the shifting of burdens in disparate impact cases are well-established. Plaintiffs bear the initial burden to show the existence of a race-related disparity caused by a particular employment practice. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975). If plaintiffs establish their prima facie case, the burden shifts to the employer to show that "legitimate and overriding business considerations provide justification" for the challenged practice. *Bonilla*, 697 F.2d at 1303. If the employer shows that the challenged practice is so justified, plaintiffs then bear the burden of showing alternative nondiscriminatory practices which would promote the same business-related interests. An employer may also rebut plaintiffs' evidence of disparity by showing that the practice is a bona fide seniority system, within the exception created by the statute in 42 U.S.C. § 2000e–2(h).

Plaintiffs have proven disparities between minority and white employees in several aspects of company's employment practices.

### Shareholder Preferences

The first group of practices have become known as the "shareholder preferences." As discussed above, the Ninth Circuit used that term to refer to those benefits enjoyed exclusively by employees who are shareholders of the company, primarily the right of assignment to driver jobs, the guaranteed overtime, and the premium wage rate. The Ninth Circuit held, and defendants do not dispute, that these practices had an adverse impact on minority employees. *Bonilla*, 697 F.2d at 1302. That impact was demonstrated by the evidence. No minorities owned shares, so the adverse impact of the disparities fell on them.

The company used its assignment right to assign numerous white shareholders to HRD and FELD positions, thus depriving minority employees of the opportunity to bid for those jobs under the collective bargaining agreement. Between 1972 and 1977, virtually all HRD positions were filled by the right of assignment and none were posted for bid. Between January 1, 1977 and July 1, 1982, 32 per cent of the 151 HRD openings were filled by the right of assignment. From July 2, 1982 until April 1985, 22 per cent of 72 HRD openings were assigned to shareholders by the company.

White shareholder HRDs and FELDs received an hourly wage premium over that earned by minority workers for the same jobs. Shareholder FELDs and HRDs were guaranteed one and one-half hours of overtime pay each day, whether the time was actually worked or not; minority and non-shareholder FELDs and HRDs were not guaranteed overtime. Taken together, the premium wage rate and guaranteed overtime ensured that white shareholder HRDs and FELDs earned 48 per cent more than minority HRDs and FELDs doing essentially the same work.

Another employment privilege reserved exclusively to the shareholders was the opportunity to hold managerial jobs within the company—none of which was held by Blacks or Hispanics. Other employment benefits which were available only to shareholders are enumerated on page 1387.

The adverse impact of all of the shareholder preferences on the minorities was severe.

### Appointment of Back–Up Drivers

Plaintiffs also challenge the practice of appointing back-up drivers to HRD positions. The genesis of this practice is somewhat uncertain. For some years, the collective bargaining agreement provided that temporary HRD vacancies could be filled by the helper on the route with the highest seniority. The practice was at some time extended to include permanent HRD positions.

The actual operation of this appointment practice was the subject of conflicting evidence, both statistical and anecdotal. The court concludes from the evidence as a whole that the operation of the appointment system did have an adverse impact on the minorities, both in the number of such appointments and in the violations of their seniority rights under the collective bargaining agreement.

### Operation of the Bidding System

The collective bargaining agreement has provided a system for all employees to bid for open jobs. There is no doubt that the system existed and was used. Defendants argue that it was a bona fide system based on seniority under Section 2000e–2(h). Plaintiffs contend that the system's operation (1) was subject to so many exceptions and manipulations that it was not a bona fide seniority system, and (2) was itself disparate treatment and disparate impact.

The bidding system and its operation were the subject of exhaustive evidence—statistical, anecdotal, documentary, and expert. Much of that evidence was conflicting. The statistical evidence and expert testimony on each side was of course selective, and the testimonial conclusions were somewhat subjective and argumentative. That statistical and expert evidence did not compel a conclusion for either side, but this court has considered it as a part of the total evidence. The difficulty in evaluating that type of evidence lies in applying the assumptions and data bases used by the

statistics and by the experts to the operative facts disclosed by the other evidence. A discussion of all of those conflicts is not necessary here. Nor is it necessary to recite all of the evidence on the operation of the bidding system. The court concludes from the evidence as a whole, after applying the defined burdens of proof and after analyzing each alleged fact regarding the operation of the system, that the bidding system was not a bona fide seniority system. While facially appearing to be so, it had so many exceptions—used frequently by the company for the benefit of its white employees—that it was not a bona fide system. The exceptions overwhelmed the system. They included: (1) the right of assignment; (2) the appointment of backup drivers; (3) violations of seniority rights; (4) abuse of "temporary" assignments; (5) selective application of the eight-month rule barring further bidding; (6) selective grants of leaves of absences; (7) some abuses of the procedures for the posting of job openings; (8) discouraging the minorities from bidding; (9) consideration of "lateral" job changes; (10) the assignments to specific routes and jobs; and (11) the results of the company's acquisition of other companies and their employees. The court also concludes that the actual operation of the system was itself disparate treatment and disparate impact.

42 U.S.C. § 2000e–2(h) of the Act provides:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment *pursuant to a bona fide seniority or merit system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin....* (emphasis added).

Absent such discriminatory intent, that section creates a defense for a system which is in fact based on seniority, *California Brewers Assn. v. Bryant,* 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980), and

which is bona fide, *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). But a system is not a defense if it is not bona fide, or if it is the result of intent to discriminate, *Scarlett v. Seaboard Coast Line R. Co.,* 676 F.2d 1043, 1051–52 (5th Cir.1982).

### Business Justification

To rebut the conclusion of disparate impact resulting from the employment practices in favor of its white shareholder employees, the company argues that the disparities were justified by "business necessity." Although the ultimate burden of persuasion remained on plaintiffs, in order to establish business justification the company had the burden of producing evidence to show that the challenged employment practices had "a manifest relationship to the employment in question." *Griggs v. Duke Power Co.,* 401 U.S. 424, 432, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971). In *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), the U.S. Supreme Court explained that job-related necessity requires that practices which have discriminatory impact must be significantly correlated with important elements of work which comprise or are relevant to the job.... *Accord, Contreras v. City of Los Angeles,* 656 F.2d 1267, 1280 (9th Cir.1981), *cert. denied,* 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). *Albemarle* involved the use of selection criteria for hiring new employees. An employer's burden to show business necessity is greater where, as here, the challenged practices are in allocating job opportunities among existing employees who have shown themselves to be qualified. *Atonio v. Wards Cove Packing Company, Inc.,* 827 F.2d 439, 442 (9th Cir.1987)[2]; *Antonio* involved hiring practices and practices regarding existing employees. In that case, Ninth Circuit explained:

> Business necessity means more than a business purpose. Business necessity requires that a practice "must substantial-

ly promote the proficient operation of the business."

827 F.2d at 442 (*quoting, Chrisner v. Complete Auto Transit, Inc.,* 645 F.2d 1251, 1262 (6th Cir.1981)).

The company here attempts to show that its use of shareholder employees to perform certain jobs was justified by legitimate business concerns. It argues that it was founded, and has continued to operate, upon principles of owner participation. That much is true, at least historically. Shareholder employees traditionally performed certain duties, such as the maintenance of route books and the collection of delinquent accounts, beyond the work of collecting garbage and driving trucks. The company maintains that such duties are still borne by shareholders employees, and that they justify the premium pay and the guaranteed overtime which the shareholders receive. However, as the company modernized and restructured its operations, those duties diminished at least by 1976–77. They are now duties which are largely performed by the company's administrative office, and which are sometimes performed by non-shareholder garbage collectors. They do not justify the differentials in pay and guaranteed overtime. The granting of those benefits to only the white shareholder employees did not "substantially promote the proficient operation of the business." *Atonio III,* F.2d at 442; *Chrisner,* 645 F.2d at 1262. The same is true of the right of assignment to HRD and FELD jobs. The minorities have shown themselves to be as capable of performing those jobs as the whites.

### Managerial Positions

The company also argues that shareholder employees are assigned to the managerial and administrative positions because of business necessity. That is, because the shareholders have an ownership interest in the enterprise, they make better managers and administrators. That con-

---

**2.** The Ninth Circuit's initial decision in *Atonio v. Wards Cove Packing Co.,* 768 F.2d 1120 (9th Cir.1985) (*Atonio I*) was withdrawn, 787 F.2d 462 (9th Cir.1985), when a rehearing *en banc*

was granted. The *en banc* panel's decided some issues, 810 F.2d 1477 (9th Cir.1987) (*en banc*) (*Atonio II*), and remanded others to the original panel, 827 F.2d 439 (9th Cir.1987) (*Atonio III*).

cept of managerial self-interest is a basic premise of the private enterprise system, and is still a good generality. But as any enterprise grows in size, there is usually a separation of ownership and management. And the success of large publicly owned corporations teaches that enterprises are successful with managers who have little or no ownership in the enterprise. Defendants have not established their business necessity argument here. Plaintiffs are entitled to be considered for managerial and administrative jobs if they are individually qualified. *E.g., Mozee v. Jeffboat Inc.,* 746 F.2d 365, 371 (7th Cir.1984). Title VII demands no more and no less.

However, the shareholders of an enterprise have the right to elect whom they wish to be the corporate officers and directors of the company. That right of election is a factor of share ownership, and not a factor of employment. *See Chavero v. Local 241, Div. of Amalgamated Transit,* 787 F.2d 1154, 1156–7, n. 4 (7th Cir.1986). The paid managerial positions must be as open to qualified minorities as they are to whites. But Title VII does not require minority representation on the elected board of directors or the elected senior corporate offices. The shareholders may elect whom they want to lead their enterprise.

### Casual Pool

■ Plaintiffs charge that the operation of the company's casual pool was discriminatory, under both disparate impact and disparate treatment analyses. After hearing the evidence, the court agrees. As explained above, the company used a casual pool of job applicants to fill daily work needs that occurred. The casual pool also served as a mechanism by which permanent employees were hired and then became members of the union. An employee who worked 30 days out of 60 consecutive days became a permanent employee. This requirement was in effect during the period of the relevant statistical and anecdotal evidence. Since July 1, 1985, casual pool members must work 60 days within a 90–day period to achieve permanent status. The selection of which employees would be

given work on any particular day, and whether they would be called a sufficient number of times to obtain permanent status, was entirely within the discretion of the company's dispatchers.

In this circuit, subjective hiring practices such as hiring from a casual pool can be subject to disparate impact as well as disparate treatment analysis. *Atonio II,* 810 F.2d 1477, 1482 (9th Cir.1987). To establish a prima facie case, plaintiffs were required to (1) identify the specific subjective practice or criterion, (2) show that a particular practice had a significant adverse impact on a protected class, and (3) show the causal relationship between the practice and the impact. *Id.*

The evidence was both anecdotal and statistical. Several minority witnesses testified that, on two or three occasions each, they had accumulated over 26 of the required 30 days and then were not called back for 60 days so that they would have to begin accumulating time anew. Plaintiffs assert, and defendants do not dispute, that there has never been an occasion when a white employee had come so close to meeting the required number of working days without being able to work the additional days necessary to achieve permanent status. There was also testimony that the dispatchers' discretion to choose the workers for each day was used to advance white employees, particularly relatives and friends of shareholders, over minorities. A statistical analysis compared the number of days that members of various ethnic groups worked in the casual pool in a given year, to the number of days that they would be expected to work in the pool under a statistical model of random distribution. Use of statistical variance, or standard deviation, demonstrated that for the years 1976 until 1985, the operation of the casual pool was materially adverse to Blacks. Although the statistics were subject to some questions on both sides, they were supported by the anecdotal evidence that whites received preferred treatment in the casual pool. The court concludes that the evidence meets the burdens of proof under *Atonio II.* And the operation of the

casual pool had a particularly adverse impact upon the minorities, because the jobs involved were the entry-level jobs being sought by persons limited in training and education.

## IX.

### DISPARATE TREATMENT

In addition to attacking the disparate impact of the employment practices, plaintiffs also charge that defendants are liable under the disparate treatment theory of discrimination. Disparate treatment

> is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.

*Teamsters,* 431 U.S. 324, 335 n. 15, 97 S.Ct. at 1843, 1854 n. 15 (1977), *quoted in Bonilla,* 697 F.2d at 1301. The burdens of proof in disparate treatment cases are well-established, although the inquiry differs somewhat between individual claims and class pattern and practice claims. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093 (1981); *Teamsters,* 431 U.S. at 334–36, 97 S.Ct. at 1854–55.

In a class pattern or practice claim, plaintiffs meet their initial burden with evidence

> showing action taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on a discriminatory criterion illegal under the Act."

*Bonilla,* 697 F.2d at 1301, *quoting Furnco Construction Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), *quoting Teamsters,* 431 U.S. at 358, 97 S.Ct. at 1866. The requisite discriminatory intent may be shown by statistical, nonstatistical and anecdotal evidence. *Penk v. Oregon State Board of Higher Education,* 816 F.2d 458, 463 (9th Cir. 1987). In response to a statistical showing

of disparity, a defendant may (1) join issue on the statistical analysis, *Id.* at 464; (2) show that the disparity is the result of neutral factors, rather than the product of discriminatory intent, *Id.;* or (3) articulate "some legitimate, nondiscriminatory reasons" for the disparity. *Bonilla,* 697 F.2d at 1301, *citing, Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The ultimate burden of persuasion remains on plaintiffs "to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice." *Teamsters,* 431 U.S. at 336, 97 S.Ct. at 1855.

In an individual claim of disparate treatment, plaintiffs must establish a prima facie case by proving that they applied for positions for which they were qualified, but were "rejected under circumstances which give rise to an inference of unlawful discrimination." *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094. For example, in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), the U.S. Supreme Court described the following model for a prima facie case of racial discrimination in a hiring case:

> [The plaintiff must show] (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

Comparable proofs satisfy the initial burden of plaintiffs alleging discrimination in discharge, *see, e.g., Flowers v. Crouch–Walker Corp.,* 552 F.2d 1277 (7th Cir.1977); *Sumler v. Winston–Salem,* 448 F.Supp. 519 (M.D.N.C.1978), and should be equally applicable in cases alleging discrimination in conditions of employment. If plaintiffs establish a prima facie case of disparate treatment, the burden of producing evidence then shifts to defendant "to articulate some legitimate, nondiscriminatory reason" for the disparate treatment.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (1973); *Bonilla,* 697 F.2d at 1301. If defendants offer such a reason, the burden shifts back to plaintiffs to show that the asserted justification was a pretext for discrimination. *Burdine,* 450 U.S. at 253, 256, 101 S.Ct. at 1093, 1095; *Bonilla,* 697 F.2d at 1302.

Because of the similarity of the claims, defenses and evidence in this case, the court will discuss both the class and the individual claims together, while recognizing that the burdens of proof differ somewhat.

■ Many of the facts which establish a prima facie case of disparate treatment have already been discussed above. Largely because of the premium wage rate and the guaranteed overtime, the compensation of the minority employees was much less than that of the white shareholder employees, for work which was generally the same. Black and Hispanic employees were underrepresented in the better paid driver positions. No minority employee became a manager or administrator. The company's bidding system was used for the benefit of the white employees. And the casual pool was operated in a discriminatory manner.

Anecdotal evidence also supported plaintiffs' claims of intentional discrimination. The company's officers testified that the company did not intend to allow minorities to become shareholders, that they would not recommend a minority member for shareholder, and that they preferred to work with white Italian–Americans rather than Black or Hispanic employees. Plaintiffs also submitted evidence of a racially discriminatory atmosphere within the company, a charge which is actionable under Title VII. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). There was evidence of actual segregation based upon race in the casual pool and in the so-called men's department. There was also evidence that the company attempted to handle the grievances of minority employees differently from those of whites. And on one occasion the company used a black employee to "window dress" a meeting with a governmental agency concerning minorities in supervisory positions.

Plaintiffs also demonstrated, as further evidence of intentional discrimination, that the company did not change practices which it knew might be discriminatory. *See EEOC v. Inland Marine Industries,* 729 F.2d 1229, 1235–36 (9th Cir.1984). In 1976 an agency of the federal government, as a contractor with the company, inquired into allegedly discriminatory practices within the company. That inquiry and subsequent discussions led to a conciliation agreement between the agency and the company. Those events alerted the company to certain discriminatory practices. But those practices were changed, if at all, only cosmetically. In addition, the Ninth Circuit's opinion in this case in 1982 put the company on notice that its shareholder preferences violated Title VII, and that there was no constitutional justification for those preferences. But few if any changes were made. In response to government pressure, the company did create a written anti-discrimination policy. But other than merely create the writing, the company did nothing. The policy was largely ignored by management and by the responsible operating personnel.

The company also advised the government agency in 1976 that its board of directors had adopted resolutions eliminating share ownership as a factor in personnel actions. But the extra compensation for shareholders continued.

Considering the statistical, nonstatistical and anecdotal evidence submitted by all of the parties, the court concludes that plaintiffs have carried their burden of proof of intentional discrimination.

Many of the company's defenses discussed above are also asserted against the class claims of disparate treatment. For the reasons stated, the court has already concluded that (1) Title VII and Section 1981 apply to the company's interrelated share ownership and employment practices, and (2) the constitution does not shield the company from the obligations of those statutes.

The Ninth Circuit stated in this case that the company may respond to plaintiffs' prima facie case by articulating "some legitimate, nondiscriminatory reasons" for the disparities; *Bonilla,* 697 F.2d at 1301, *citing Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093. The burden of producing a "legitimate, nondiscriminatory reason" in defense of a disparate treatment claim is, in this case, essentially similar to the defense of "business necessity" to the disparate impact claims. This court has already discussed the company's evidence and defenses in the disparate impact portion of this case, and there is no need to duplicate that discussion here. For the reason stated above, the court concludes that the company has not established legitimate, nondiscriminatory reasons for the disparate treatment of plaintiffs.

## X.

## OTHER EMPLOYEES AND THE CLASS

 The above discussion pertains almost entirely to employees of the company who were members of Teamsters Local 70 or members of the casual pool. However, this action was also brought on behalf of the company's other employees. They include: (1) repair and maintenance employees who are members of Local 1546; (2) landfill employees, most of whom are members of Local 6; and (3) clerical and administrative employees, who are not unionized.

At the time of making its conditional class determination earlier in this case, the court included all of those employees within the defined class. However, because of the evidence and lack of evidence at the trial, the court does not believe that these other three groups of employees are appropriately members of the class.

With respect to the landfill employees, plaintiffs presented little or no evidence. Whatever relevant evidence may have been introduced was not sufficient to carry plaintiffs' burden of establishing a prima facie case or their burden of persuasion.

As to the repair and maintenance employees and the clerical and administrative employees, plaintiffs did introduce some limited evidence. It consisted primarily of the testimony of one employee in each group. However, that testimony pertained to matters individual to those two employees and did not provide evidence of class-wide significance. Even that individual testimony was not sufficient to carry plaintiffs' burden of showing discriminatory employment conduct against those witnesses.

Plaintiffs introduced some statistical evidence, which included the racial composition of those groups. But that statistical evidence was merely raw data on their racial composition. It contained no computations of standard deviation or random analysis, and it did not identify the qualifications or seniority of the employees in those groups.

The court therefore concludes that plaintiffs have not proved their claims, either a prima facie case or their burden of persuasion, with respect to the landfill, repair and maintenance, or clerical and administrative employees. The class in this case must be redefined to exclude them.

One can reasonably question the consequences of this result; that is, a decision which finds serious discrimination and awards relief as to most, but not all, of the company's employees. But this court is bound by the law and by the evidence presented to it. The company should also consider the future problems of the potential disparities in its application of this decision to its total work force.

 The class is hereby redefined to include all Black and all Hispanic-surnamed persons who on or after January 10, 1972, have been employees of defendant Oakland Scavenger Company covered by Teamsters Union Local 70, or have been working in the casual pool. This action is properly brought and maintained as a class action on behalf of that class. The court finds that the class is so numerous that joinder of all members is impractical, that there are questions of law and fact common to the class, that the claims of the representative parties (*i.e.* the plaintiffs-in-intervention) are typical of the claims of the class, and that the representative parties fairly

and adequately protect the interests of the class. The court also finds that the prosecution of separate actions by the individual members of the class would create a risk of adjudications with respect to individual members which would as a practical matter be dispositive of the interests of the other members who are not parties to that adjudication, or would substantially impair or impede their ability to protect their interests. The court also finds that the company has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final and injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## XI.

### TEAMSTERS LOCAL 70

The court now discusses the alleged liability of the defendant union. Plaintiffs charge that Teamsters Local 70 is liable for both disparate impact and disparate treatment discrimination. "Title VII and Section 1981 prohibit discrimination by unions to the same extent they prohibit discrimination by employers." *Bonilla*, 697 F.2d at 1304, (*citing McDonald v. Santa Fe Transportation Co.*, 427 U.S. 273, 284–85, 96 S.Ct. 2574, 2581, 49 L.Ed.2d 493 (1976)).

 A union's duty is to oppose discrimination. This duty arises not only from the dictates of Title VII, but also from the union's duty to fairly represent all of the employees in the bargaining unit. If a union acquiesces in an employer's discriminatory practices, it is also liable under Title VII. *Id.; Kaplan v. International Alliance of Theatrical and Stage Employees and Motion Picture Operators*, 525 F.2d 1354, 1360 (9th Cir.1975). In negotiating a collective bargaining agreement, a union has an affirmative duty to bargain in an attempt to eliminate discriminatory provisions of the agreement. *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979, 989 (D.C.Cir.1973).

 Other than by those generalities, the measure of a union's liability has not been precisely delineated. In cases where collective bargaining agreements contained provisions later found to be discriminatory, some courts seem to impose liability on the union merely because the union signed the contract. *E.g., Macklin* 478 F.2d at 989; *Jackson v. Seaboard Coast Line Railroad Co.*, 678 F.2d 992, 1016 (11th Cir.1982). However, in cases where evidence of the bargaining history was presented, as in this case, some courts have adopted a more refined analysis to evaluate the union's efforts to eliminate discriminatory practices. *Terrell v. United States Pipe & Foundry Co.*, 644 F.2d 1112, 1120–21 (5th Cir.1981); *Burwell v. Eastern Air Lines, Inc.*, 458 F.Supp. 474, 502–503 (E.D.Va.1978), *aff'd*, 633 F.2d 361 (4th Cir.1980). Under that approach, a court must first determine whether a union's efforts were sufficient to absolve the union of liability. *Waker v. Republic Steel Corp.*, 675 F.2d 91, 92–93 (5th Cir.1982). For this step in the analysis, this court adopts the following test which the Fifth Circuit has used:

> liability turns upon whether that party has proved to the full satisfaction of the courts that it has taken every reasonable step to bring employment practices into compliance with the law.

*E.g., Terrell*, 644 F.2d at 1120.

The Ninth Circuit has not specifically defined the degree of acquiescence or resistance that is necessary to measure the possible liability of a union. *See Bonilla*, 697 F.2d at 1304; *Kaplan*, 525 F.2d at 1360 (imposing Title VII liability where union maintained hiring list in specialized industry). But the Fifth Circuit's formulation quoted above appears to accord, at least implicitly, with the Ninth Circuit's decision in *Social Services Union v. Santa Clara*, 609 F.2d 944 (9th Cir.1979), where the court allowed a union to represent its members in a Title VII class action notwithstanding the fact that the union had agreed to a discriminatory provision in the collective bargaining agreement.

 As a second step, even if the union did not do enough, a court may determine whether that union's efforts may nevertheless excuse it from liability for any backpay award. *Burwell*, 458 F.Supp. at 503. In *Burwell*, the court found the union

guilty of unlawful discrimination because it had "failed to take adequate steps to challenge the illegal provisions contained [in the collective bargaining agreement]." *Burwell*, 458 F.Supp. at 502. But the court also then noted that

> as a practical matter the Union was virtually powerless to alter [the employer's] policy. The policy was in no real sense the product of negotiation. It was unilaterally imposed by Eastern. The Union acquiesced under protest.

458 F.Supp. at 503 (citations omitted). Because of the union's bona fide efforts to eliminate the illegal practices, the court there assessed back pay awards against the employer only, and imposed only injunctive relief on the union. *Id.* at 503.

This court does not believe that there is sufficient evidence to conclude that the union intentionally discriminated against the plaintiff minorities. Minority members voted, participated in union democracy, and held offices in the union. However, plaintiffs challenge the actions of the union in several additional respects. To determine whether the union is liable for any of those challenged actions, this court will examine whether Local 70 "has taken every reasonable step to bring employment practices into compliance with the law." *Terrell*, 644 F.2d at 1120. And if not, decide whether the union was merely acquiescing in practices or provisions that were imposed by the company and which the union had no real power to stop. *Burwell*, 458 F.Supp. at 503.

■ Plaintiffs allege that the shareholder employees should not have been a part of the bargaining unit. The argument is that as owners of the company, the shareholder employees have inherent conflicts of interest with the other employees. The history of the organization of the company's employees by Local 70, and the formation of the bargaining unit, were presented extensively in the evidence. There were valid reasons for admitting shareholder employees into the unit. The reasons were ones of bargaining judgment. The bargaining risks and possible adverse consequences of not having the sharehold-

ers in the unit could have been greater than any conflicts of interest. And the conflicts were not inherent, at least in matters regarding discrimination. The court also believes that plaintiffs have not established that any harm proximately resulted to them from having shareholders in the unit. The issues voted on by the union members were economic issues between the union and the company, and were not issues of race or discrimination. While a unit of shareholder and nonshareholder employees may not be wholly desirable, this court cannot say that such a unit violated Local 70's duties to plaintiffs with respect to discrimination issues.

■ The right of assignment to HRD and FELD positions did operate to discriminate against the minority employees. That right of assignment was included in the collective bargaining agreements between Local 70 and the company. Under that clause, the company assigned shareholders to certain jobs in violation of the seniority provisions of the collective bargaining agreements. Local 70 consistently opposed the right of assignment in the collective bargaining since 1967. And it was successful in narrowing, but not eliminating, the scope of the right. The 1967 contract contained a very broad right of assignment, allowing the company to assign a shareholder to any collection route other than a one-man operation. Presumably because of Local 70's efforts, the right of assignment in the 1970 agreement was narrowed to its present form, in that the company could only assign shareholders to routes on which money is collected. Although the union again proposed elimination of the right of assignment in 1973, 1976 and 1979, the clause remained in the contracts essentially unchanged. Applying the *Terrell* and *Burwell* tests, the court concludes that the union made reasonable efforts to eliminate the right of assignment. The union had some success in narrowing the clause. And the company was insistent, if not intransigent, on maintaining this right in the collective bargaining agreements. The union is therefore not liable for this discrimination practice of the company.

■ The premium wage rate for shareholder employees is discriminatory. The union first learned in 1975 that the shareholder employees were receiving premium wages, above the rates for those jobs stated in the collective bargaining agreement. When it learned of this differential, the union wrote to the company and demanded a meeting. The company responded, but the union admits that no meeting was held. And the union took no further action on the matter until the 1976 contract negotiations. In those negotiations, the union was misled by a statement from the company's representatives that only the contract wage rates were being paid to all employees. However, the company continued to pay premium wages to its shareholder employees. The mere fact that the premium wages were *above* the contract rates did not allow the union to ignore the issue, as wage rates are clearly a subject closely related to the collective bargaining relationship. But this court concludes that the union's efforts were adequate, particularly since it was misled by the company. It also concludes from the evidence that the company would have insisted on retention of the premium pay, in the same manner it insisted on retention of the right of assignment. Therefore, the union is not liable for the discriminatory wage rate paid to the shareholder employees.

The union has been aware since 1969 of the company's practice of paying shareholder employees one and one-half hours of guaranteed overtime per day. In later contract negotiations, the union proposed eliminating the practice; but the company rejected the proposal on each occasion. These efforts were a bona fide attempt to eliminate the discriminatory practice, and are sufficient to relieve the union of any liability for this practice.

■ Another alleged discriminatory practice charged against the union is the exclusion of minorities from managerial positions. Although the company is liable for such discrimination, the union has no duty under Title VII to protect its members from allegedly discriminatory promotion decisions at a *managerial* level. *Harris v.*

*Anaconda Aluminum Co.,* 479 F.Supp. 11, 51 n. 29 (N.D.Ga.1979) (union has no legal responsibility for promotions or transfers to salaried or supervisory positions outside of bargaining unit); *see also, Edmonds v. Southern Pacific Transp. Co.,* 19 FEP 1052, 1073–74 (N.D.Cal.1979) (union not liable under Title VII as it was not involved in employer's decisions regarding hiring, transfer and promotions). Promotions to management are outside the scope of the union's collective bargaining responsibilities.

■ Plaintiffs also allege that the work-place grievances of minority employees were not handled with the same diligence as those of white employees. This parallels plaintiffs' claim that Local 70 was in essence a "sweetheart" union that existed more for the benefit of the company than for the members. The court does not believe that either charge was supported by the evidence. When and how far to take grievances are often difficult decisions for a union. The decisions may depend on factors that do not appear adequately in personnel records, and are often judgmental. The court concludes that plaintiffs have not shown that minority grievances were handled by the union in any manner materially different from those of white employees. The grievance procedures were used frequently by the minorities and generally functioned as intended. They produced results for the minorities. Nor does the evidence establish that defendant Local 70 was a "sweetheart" union. It bargained extensively and vigorously with the company and obtained material economic benefits for its members, both white and minority.

Plaintiffs also allege that the union was responsible for the discriminatory operation of the bidding system under the collective bargaining agreement. For the reasons discussed above, the court has concluded that the system was not a bona fide seniority system, and that its mere existence does not provide a defense to either the company or the union. However, the court concludes from the evidence that the deficiencies in the operation of the system

were caused by the company and not by the union.

The court therefore finds in favor of Local 70 and against plaintiffs. The union should, however, consider the extensive discrimination which this court has found to exist within the company, in its further collective bargaining and grievance handling.

## XII.

### ORDER

For the reasons discussed above, the court decides and ORDERS as follows:

1. This action is maintained and may hereafter be maintained as a class action. The class is now and hereafter defined as: All Black and all Hispanic-surnamed persons who on or after January 10, 1972, have been employees of Oakland Scavenger Company and who have been members of Teamsters Local 70, or have been members of the casual pool.

2. Defendant Oakland Scavenger Company has violated 42 U.S.C. § 2000e and 42 U.S.C. § 1981, and is liable to plaintiffs and to the plaintiff class for the actions and practices discussed above. Provided, however, that defendant Oakland Scavenger Company is not liable (a) for not offering the opportunity to purchase stock, or (b) for not electing minorities as directors or officers of the company.

3. Defendant Teamsters Local 70 has not violated 42 U.S.C. § 2000e or 42 U.S.C. § 1981, and is not liable to plaintiffs or to the plaintiff class. Judgment should be entered in its behalf.

4. A status and scheduling conference will be held on January 29, 1988, at 11:00 a.m. The purpose of the conference is to discuss and schedule the procedures necessary for the pretrial preparations and the trial of the remedies portion of the case.[3]

---

**3.** The court acknowledges the assistance of Carl Blumenstein and Carrie Masarik in the prepara-
tion of this opinion.